DAVID SHINEFELD AND ESTATE OF JEANETTE SHINEFELD, DECEASED, DAVID SHINEFELD, EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2504-73. Filed March 3, 1976.

*Leonard Sarner,* for the petitioners.
*Howard W. Gordon,* for the respondent.

OPINION

On his 1970 income tax return, petitioner claimed a business bad debt deduction under section 166(a)(1)[8] of $293,275, the amount of the loss he suffered on his loans to Gale. Respondent concedes the existence and the amount of the debts but contends that they should not be allowed on the ground that they constituted nonbusiness debts under section 166(d).[9] The parties are in agreement that, in determining whether the debts bore a proximate relationship to petitioner's trade or business, "the proper measure is that of dominant motivation." *United States v. Generes,* 405 U.S. 93 (1972); *Robert E. Imel,* 61 T.C. 318, 324 (1973). The issue is one of fact. *Oddee Smith,* 60 T.C. 316 (1973); sec. 1.166-5(b)(2), Income Tax Regs.

Petitioner's trade or business was that of performing services for Multipane as an employee.[10] See *David J. Primuth,* 54 T.C. 374 (1970).

---

[8] SEC. 166. BAD DEBTS.
(a) GENERAL RULE.—
(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
[9] Sec. 166(d) provides:
(d) NONBUSINESS DEBTS.—
(1) GENERAL RULE.—In the case of a taxpayer other than a corporation—
(A) subsections (a) and (c) shall not apply to any nonbusiness debt; * * *
* * *
(2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
[10] Petitioner does not argue that his duties as a director of Gale or Multipane constituted a separate trade or business to which the debts were related or that he was in a separate trade or business of making loans.

Petitioner contends that his dominant motivation in making the loans in question was "to protect and preserve his managerial position and everyday control as the Chief Executive and highly salaried officer of Multipane and his status, reputation and image to the trade as the continued successful operator of the glass business." (Petitioner's brief, pp. 19-20.) Respondent, relying principally on the size of petitioner's Gale stockholdings (about $2 million at the time of the first loan and almost $700,000 at the time of the second) compared with his annual salary from Multipane ($40,000 to $50,000, plus an unknown contingent amount),[11] see *United States v. Generes, supra,* argues that petitioner's purpose was to preserve the value of his investment in Gale.

The picture of petitioner which emerges from the record is that of a highly competent businessman justifiably proud of his achievements. He had acquired a considerable degree of financial security at a relatively young age.[12] We do not believe he seriously doubted his ability to earn a comfortable living elsewhere should Multipane fail, nor for that matter his ability to steer it through Gale's financial storms. Nor do we believe, considering his low opinion of Gale's management, that he made the loans in question to preserve or enhance the value of his Gale stock. Foremost in his mind at the time he made each loan was the danger which the business adventuresomeness of the Gale group and the attendant financial drain posed to Multipane. Regarding the purpose for the June 1967 loan, petitioner testified to WGL's troubles and continued:

A Well, the purpose in my mind was that while he [Gerald Gluckin, chief executive of WGL] was negotiating with these people in Boston and these people in New York were putting pressure on him that if I could help alleviate the pressure from the New York fellows he might not have to go to Boston and take the assets of Multipane and put them into the Gluckin group.

Q Now, in your own mind, will you then tell me why did you prefer not to have the assets of Multipane in the Gluckin subsidiary?

[11] While the record permits no specific findings to be made as to the amount of such compensation accrued or anticipated at the relevant dates, consolidated financial statements attached to a March 1968 proxy statement to Gale shareholders indicated that deferred compensation due to petitioner and two others totalled $3,000 as of Oct. 31, 1967. In 1970 petitioner accepted $40,000 in full settlement of his claim for contingent compensation.

[12] Petitioner was 58 years old at the time of trial in 1975.

A Because this Gluckin outfit was always running into us for money. And they—and they—and they could have been the cause of Multipane running into cash problems of its own.

Q Would it in any way have affected your managerial capacity?

A It sure would. It would have presented a bad picture both to the industry and to my suppliers. *And this would have been bad for Multipane.* The word would have spread immediately throughout the entire—

Q Would it have affected—

A —glass industry.

Q —your employment agreement?

A Well, sure, because anything that would have affected Multipane in a detrimental manner would certainly affect me.

[Emphasis supplied.]

As to the $50,000 advanced in January 1969, he testified:

Q Can you tell me the circumstances of the 1969 loan and the purpose for it—

A Well, again—

Q —which took place—let me finish—in January of 1969?

A Again, we were facing that same—

Q When you say "we"—

A "We", I mean Multipane, Gluckin, Gale, everybody that's mixed up in this bit. Again, they—they don't have any money. They're running out of money, and I had already been visiting some of my biggest accounts and trying to calm them down. * * * Then they were worried. They heard that we didn't have any money and why should they continue to do business with us because they heard that we were getting ready to close our doors—

Q Now, I'm talking about the loan—

A But the loan that I—well, that's what I'm saying. That the loan I gave them again was to help them with their cash position so that my customers wouldn't get word that they [sic] were still financial troubles going on. Because had they known it, again they would begin to say, well, jeez, with this warranty I don't want to do business with Multipane. In spite of our good record with them, I certainly wouldn't have blamed them.

It is clear from these excerpts that Multipane's problems, not his own, were petitioner's chief cause of concern. The fact that he did not directly own any of Multipane's stock does not persuade us otherwise; he evidently took a continued fatherly interest in the company's fortunes. Nor can petitioner prevail on the basis that Multipane's business was his business. The fact that a loan or payment is made in furtherance of the employer's trade or business does not mean it is proximately related to that of the employee. *Robert E. Imel, supra; James D. Robinson,* 45 B.T.A. 39 (1941). Cf. *Deputy v. du Pont,* 308 U.S. 488 (1940); *Tony Martin,* 25 T.C. 94 (1955).

Indubitably, petitioner made the loans in question from a complex of motives. He had an annual salary to protect under a multiyear employment contract, along with the possibility of substantial additional contingent compensation. He owned a large block of Gale's stock. Finally, his personal pride in seeing Multipane prosper was at stake. We credit petitioner's testimony that he made the loans principally to protect Multipane. But we cannot accept his contention that he did so out of concern for his own employment security. Continuation of his salary and contingent compensation may have played a role in his decision, but we are unable to conclude that the role was a dominant one. Nor are we convinced that petitioner's status, reputation, and image to the trade were so endangered as to satisfy the dominant motive standard. Cf. *James E. Anderson,* 56 T.C. 1370, 1373-1374 (1971), revd. on another issue 480 F. 2d 1304 (7th Cir. 1973); *Laurence M. Marks,* 27 T.C. 464, 467 (1956). If one motive must be lifted from its psychic matrix and labeled "dominant," it would be the motive to protect Multipane itself, the business which petitioner had built from a shoestring and still regarded as "his." [13] Cf. *Kelson v. United States,* 503 F. 2d 1291 (10th Cir. 1974).

We conclude the loans in question were not proximately related to petitioner's trade or business as an employee and were nonbusiness debts subject to the limitation imposed by section 166(d).

*Decision will be entered for the respondent.*

---

[13] The *Generes* opinion, although emphasizing the greater reliability of "objective" evidence, does not preclude us from drawing this inference from petitioner's credible testimony. *William G. Young,* T.C. Memo. 1974-76; *Geraldine R. Mann,* T.C. Memo. 1975-74.