FLORISTS' TRANSWORLD DELIVERY ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1996–74.   Filed November 30, 1976.

■■■■■■■■■■■

*N. Barr Miller* and *Walter D. Haynes,* for the petitioner.
*Chauncey W. Tuttle, Jr.,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| TYE June 30— | Deficiency | TYE June 30— | Deficiency |
|---|---|---|---|
| 1967 | $84,283.95 | 1970 | $178,187.93 |
| 1969 | 167,976.83 | 1971 | 11,796.46 |

The deficiency asserted for the taxable year ended June 30, 1971, has been paid by petitioner and a refund claim therefor is now pending.[1] The parties have reached an agreement concerning certain of the issues underlying the deficiencies for the other 3 years. Remaining for our consideration are the following questions:

(1) Whether any receipts of petitioner's Clearing House and Marketing Divisions were income to petitioner.

(2) Whether petitioner's payment in settlement of a private antitrust action was allocable in part to each of the petitioner's divisions or was solely an expense of its Membership Fulfillment Division.

### FINDINGS OF FACT

The stipulation of facts and accompanying exhibits are incorporated herein by this reference.

Petitioner Florists' Transworld Delivery Association (hereinafter sometimes FTD), organized as a nonprofit corporation under the laws of the State of Michigan,[2] maintained its principal place of business in Detroit, Mich., at the time it filed its petition herein. FTD timely filed its Federal income tax returns on the accrual basis for each of the years in question.

Petitioner is a membership organization composed of individuals, partnerships, firms, and corporations engaged in

---

[1] The record contains no indication as to the situation with respect to the 1968 taxable year.

[2] Petitioner was incorporated in 1924 as Florists' Telegraph Delivery Association. In 1965, petitioner changed its name to Florists' Transworld Delivery Association.

the retail florist business. In order to become and remain a member of FTD, florists must observe certain standards in respect of their shops, equipment, bookkeeping, and floral stock and must maintain a reputation for honest and ethical business conduct. Memberships are not transferable.

FTD's activities are principally divided among four divisions: Publications Division, Membership Fulfillment Division, the administration of a Clearing House Fund (hereinafter Clearing House Division), and the administration of a Marketing Fund (hereinafter Marketing Division). The Publications Division publishes the FTD News, the FTD News Letter, and the trade magazine Florist; it derives its revenues from member and nonmember advertising, member and nonmember subscriptions, and book sales. The Membership Fulfillment Division investigates applicants, processes membership applications, enforces membership rules, guarantees the payment of accounts contracted between members, and sponsors trade fairs and an annual convention. This division derives revenue from application fees, membership fees and dues, trade fair and convention receipts, membership fines, and interest from members' credit deposits. The revenues, less expenses, of these two divisions are added to (or, in the case of losses, deducted from) FTD's general fund and were reported on petitioner's returns for the years in issue as taxable income or loss.

Petitioner's Clearing House Division enables members to accept customer orders for delivery to distant areas by telephoning such orders to a member florist in the city of delivery who then fills the order. The delivering florist bills the Clearing House Division, which pays for the order and bills the sending florist. To cover the cost of its operations, advances from members are collected.[3] Petitioner's Marketing Division, which conducts national advertising, is similarly funded by members' advances.[4] The advances to both divisions are made pursuant to the following bylaws:

[3] Other clearing house receipts are discussed at pp. 339–340, *infra*.
[4] Other marketing receipts are discussed at p. 340, *infra*.

## BYLAW III
### ADVANCES

Section 1.

Each Member shall advance monthly the following sums:

(a) 1% on the gross amount of all incoming orders *to be used for Clearing House Operations.*

(b) 2% on the gross amount of incoming orders and 2% on the gross amount of outgoing orders *to be used for national advertising, publicity, public relations and service to Members.* [Marketing Division.]

## BYLAW V
### ACCOUNTING

\* \* \*

Section 3.

Advances received pursuant to Bylaw III hereof shall be held in one or more reserve accounts.

Section 4.

An individual account shall be set up for each Member on the books of the Association for each classification of advances specified in Bylaws III \* \* \* and these accounts shall be credited for all related advances made by such Member. Charges shall be made from time to time on a pro rata basis to each Member's appropriate individual reserve account based on the actual cost of the particular operation or the losses to be deducted from the Credit Deposit Fund. *Any balances in such individual Member's account shall remain the property of such Member.*

Each Member shall receive an annual statement showing for the fiscal year all credits, charges, deductions and balances in his own reserve accounts insofar as they relate to advances made pursuant to Bylaw III.

When a membership is terminated for any reason whatsoever, all credit balances in the reserve accounts of the Member consisting of advances made pursuant to Bylaw III and which remain in the reserve accounts at the end of 120 days after his membership is terminated, shall be returned to such Member.

\* \* \*

Credit balances in Members' Reserve Accounts shall be returned to Members who created the same when the operation for which the particular advance was made has been terminated. Such advances shall be so returned in whole or in part when no longer required. Any such return shall be made upon the recommendation of the Finance Committee and the approval of the Board of Directors.

[Emphasis added.]

Assuming a California florist receives a $15 order for delivery in New York and transmits such order to a New York member florist, the California florist would be entitled to a commission, $3 in this case, on the order. The New York florist would fill the order and bill the Clearing House for $12. The Clearing House would pay the New York florist $12 less

$0.15 (or 1 percent of the gross sale) as that member's clearing house advance and less $0.30 (or 2 percent of the gross sale) as that member's marketing advance. The Clearing House would then bill the California florist for $12 plus $0.30 (or 2 percent of the gross sale) as that member's marketing advance. The petitioner's bookkeeping entries for these transactions would be represented as follows:

| CALIFORNIA (SENDING) FLORIST | | | | NEW YORK (DELIVERING) FLORIST | | | |
|---|---|---|---|---|---|---|---|
| CLEARING HOUSE ACCOUNT | | | | CLEARING HOUSE ACCOUNT | | | |
| $15.00 | Order sent | $3.00 | Retained commission | $3.00 | Commission paid | $15.00 | Order filled |
| .30 | Marketing advance | 12.30 | Check received | .30 | Marketing advance | | |
| | | | | .15 | Clearing House advance | | |
| | | | | 11.55 | Check sent | | |

Further assuming that each florist transacted no other business through FTD that year, that each florist's share of marketing expenses was $0.28, and that the delivering florist's share of clearing house expenses was $0.14, representative bookkeeping entries would be as follows:

| CALIFORNIA (SENDING) FLORIST | | | | NEW YORK (DELIVERING) FLORIST | | | |
|---|---|---|---|---|---|---|---|
| CLEARING HOUSE ACCOUNT | | | | CLEARING HOUSE ADVANCE ACCOUNT | | | |
| $0.00 | Operating expenses | $0.00 | Advance | $0.14 | Operating expenses | $0.15 | Advance |
| 0.00 | To reserve account | | | 0.01 | To reserve account | | |

| CLEARING HOUSE RESERVE ACCOUNT | | | | CLEARING HOUSE RESERVE ACCOUNT | | | |
|---|---|---|---|---|---|---|---|
| | | $0.00 | From advance account | | | $0.01 | From advance account |

| MARKETING ADVANCE ACCOUNT | | | MARKETING ADVANCE ACCOUNT | |
|---|---|---|---|---|
| $0.28 Expenses[5] | $0.30 Advance | | $0.28 Expenses[5] | $0.30 Advance |
| 0.02 To reserve | | | 0.02 To reserve | |

| MARKETING RESERVE ACCOUNT | | MARKETING RESERVE ACCOUNT | |
|---|---|---|---|
| | $0.02 From advance account | | $0.02 From advance account |

Moneys advanced by members for the Clearing House Division could only be applied by petitioner to clearing house expenses and members were advised to list the yearend excess of their advances over their prorata share of such expenses as their own assets. Moneys advanced by members to the Marketing Division could only be applied by petitioner for advertising expenses and members were similarly advised to list the yearend excess of their advances over their prorata share of such expenses as their own assets. Such advances to both divisions were "placed in a single bank checking account."[6]

Refund of a member's credit balance was required to be made upon termination of membership;[7] refunds could be,

---

[5] Expenses are prorated on the basis of each member's advances in relation to all advances made. A portion of petitioner's general administrative and overhead expenses is allocated to the Clearing House and Marketing Divisions. Respondent has not raised any question herein as to the propriety of the amounts so allocated except in respect of the allocation to the service charges and fines attributable to clearing house operations (see pp. 339–340, *infra*); the amounts allocated to the miscellaneous receipts of the Marketing Division have been stipulated. See n. 10, p. 340, *infra*.

[6] The quoted words are from the stipulation of the parties. It is not clear in the record whether this account also included other receipts of petitioner, although the inference to be drawn from the record herein is that it did.

[7] When a membership is terminated prior to the end of the fiscal year, the balance refundable to the member is the balance as of the end of the previous fiscal year. The member's share of operating expenses for the year of termination is deemed to be the amount credited to his advance account for that year.

and, in fact, occasionally were, made upon board of directors' approval. See p. 336, *supra*.

For the years in question, petitioner reported on its tax returns receipt of the following amounts as advances, but did not include any net income or loss from the operations of either division in its calculations of taxable income:

| TYE June 30— | Clearing House | Marketing |
|---|---|---|
| 1967 | $1,018,534.90 | $4,086,700.29 |
| 1969 | 1,230,938.59 | 4,936,005.88 |
| 1970 | 1,308,125.28 | 5,250,383.99 |

On or before the 15th of each month, petitioner mails statements to its members covering Clearing House transactions for the prior month. Members with debit balances are required to remit payment to the Clearing House on or before the 25th of the same month in which the statement is received. If a member's check to petitioner is returned by the bank for insufficient funds, that member must pay a service charge of $10 to the Clearing House. Failure to submit payment by the appointed date results in a delinquency. Any member who is delinquent twice in any 12-month period is required to pay a $50 fine for each additional delinquency in that 12-month period.

The service charges and fines collected by the Clearing House are used to pay that portion of clearing house expenses attributable to processing returned checks and delinquent accounts. These expenses include manual processing, long-distance telephone calls, correspondence, miscellaneous paperwork, computer time, interest expenses,[8] and a portion of the clearing house general overhead expenses.

---

[8] Petitioner's Clearing House issues checks monthly to members in payment for orders filled. The Clearing House often does not have sufficient cash with which to meet expenses and these obligations and, therefore, relies heavily on monthly bank borrowings. To the extent that returned checks and delinquent accounts result in a smaller cash supply, further borrowings are necessary.

Occasionally, there is a positive cash balance in the Clearing House between the 25th of one month and the 15th of the following month. Petitioner is not authorized to invest such balance. Once during the years in issue, however, petitioner did earn interest on the clearing house positive cash balance. In July 1969, it earned $2,463.11 which it credited to its general revenue and reported as income.

Petitioner received the following amounts for the taxable years ending June 30, 1967, June 30, 1968, June 30, 1969, and June 30, 1970, as such service charges and fines from members:[9]

| TYE June 30— | Amount | TYE June 30— | Amount |
|---|---|---|---|
| 1967 | $32,241.38 | 1969 | $44,520.00 |
| 1968 | 38,590.00 | 1970 | 41,613.51 |

Petitioner's total clearing house expenses, less expenses attributable to its international operations (see n. 9 below) were as follows:

| TYE June 30— | Amount | TYE June 30— | Amount |
|---|---|---|---|
| 1967 | $964,908.30 | 1969 | $949,812.21 |
| 1968 | 925,331.73 | 1970 | 865,914.94 |

In addition to members' advances, the Marketing Division derives revenue from the following activities: printing or acquisition of promotional material for members (such as calendars, signs, and stuffers) and office supplies for members (such as order pads or forms); the processing or arranging for the processing of its members' billings to their customers, i.e., charge accounts; the conducting of education and research for members on the retail florist industry, including seminars and classes; and arranging for members to purchase gifts from suppliers when the member's customer desires to wire gifts other than flowers to friends in other cities.[10]

In 1961, petitioner was sued in Federal District Court by Florists' Nationwide Telephone Delivery Network—America's Phone-Order Florists, Inc. (FNTDN), for antitrust violations. FNTDN was organized several years prior to the commencement of suit and was composed of certain FTD members who paid FNTDN an annual franchise fee. FNTDN franchises were limited to one "select" FTD florist per city for the purpose of trading in intercity flower orders exclusively among themselves while using FTD's Clearing House to effect

---

[9] In addition to advances, service charges, and fines, the Clearing House had receipts from its International Division and incurred expenses related thereto; the tax treatment of such receipts and expenses does not appear to be an issue herein.

[10] The parties have stipulated the amount of marketing receipts derived from these activities and the expenses related thereto.

such orders. FNTDN's operations worked a boycott of FTD members who were not FNTDN franchisees.

In response to FNTDN's activities, petitioner had adopted two new membership rules in 1961 precluding its members from establishing exclusive exchanges of orders and from holding themselves out as "select" or exclusive wire-service florists where other FTD members are present in the area.

These rules formed the basis of FNTDN's claim that FTD violated the antitrust laws. After a jury trial, FNTDN was awarded $450,000 as treble damages but was denied injunctive relief. Both parties appealed and the Court of Appeals for the Seventh Circuit reversed both the damage award and the denial of injunctive relief and remanded the case for a new trial. (*Florists' Nationwide Tel. Del. Net. v. Florists' Tel. Del. Assn.,* 371 F.2d 263 (7th Cir. 1967)). In petitioner's 1968 fiscal year, the case was settled; petitioner paid FNTDN $150,000 without admitting any liability.

In computing its tax liability for the years in question, petitioner reported no income[11] and claimed no expenses[12] in respect of its Clearing House and Marketing Divisions. Also, for 1968, petitioner claimed the $150,000 payment in settlement of the antitrust action as an expense fully deductible against its reported gross income.

Respondent determined that all receipts of the Clearing House and Marketing Divisions constituted gross income to petitioner from which all division expenses were deductible.[13] Alternatively, respondent determined that, if members' advances were not income to petitioner, then (1) at least the receipts of the Clearing House and Marketing Divisions not derived from members' advances were gross income to petitioner and (2) the payment in settlement of the FNTDN antitrust suit was an expense allocable in part to petitioner's Clearing House and Marketing Divisions as well as to its

---

[11] With the exception, however, noted in n. 8 *supra.*

[12] With the exception, however, of a deduction inadvertently claimed for 1967 relating to a portion of a loss resulting from the Marketing Division's complete billing service; petitioner tendered an amended 1967 return (deleting this deduction) to the revenue agent auditing this year upon commencement of the audit. The amended return was rejected, but an adjustment therefor was made in the deficiency notice.

[13] In effect, respondent would tax the annual increase in each division's fund. See also n. 5 *supra.*

other divisions, with the result that a portion of the deduction for such payment would be lost.

Petitioner has collected clearing house and marketing advances in substantially the same manner since March 1944. It has consistently excluded from its taxable income any increases or decreases in the balances in the accounts of those divisions. Upon audit of petitioner's tax return for the taxable year ended June 30, 1944, respondent's agent issued a report on May 25, 1945, which stated in part as follows:

> As of March 1, 1944, the by-laws of the Association were amended whereby from that time on the 2% clearing house fees were collected from the members as advance fees against which all expenses are ratably charged to each member. The excess of fees collected from each member over expenses chargeable to him are returnable to the member upon his withdrawal from the Association or earlier if working capital permits.
>    * * *
> Clearing house fees collected in advance after March 1, 1944, are held not to be income to the Association. [14]

After issuance of the foregoing agent's report, petitioner's treatment of the annual increases or decreases in the clearing house and marketing accounts as resulting neither in taxable income nor loss to petitioner was not changed by the respondent upon audit of petitioner's returns through the taxable year ending June 30, 1962. Following audit of petitioner's tax returns for the taxable years ending June 30, 1963, through June 30, 1966, a revenue agent's report dated November 27, 1967, characterized such clearing house account increases as taxable income.[15] Petitioner protested this report with the District Director, who then issued a report reversing the agent's adjustments and excluding such amounts from taxable income.

On October 17, 1969, petitioner filed with respondent a request for a ruling to the effect that, upon amendment of its bylaws effective July 1, 1970, it would operate on a cooperative basis and be entitled to deduct patronage

---

[14] The parties submitted only the above-quoted portion of the 1945 report, with the result that we are unable to determine from the record whether the report dealt with the Marketing Division advances.

[15] As is the case with the 1945 report (see n. 14 above), the stipulation deals only with the treatment of the Clearing House accounts insofar as the 1967 report is concerned, and the record is otherwise silent as to the treatment accorded the Marketing Division accounts.

dividends. On January 23, 1970, respondent acted favorably on the request. The letter ruling provided, inter alia:

FTD proposes to amend its bylaws so that it will be "operating on a cooperative basis" as that phrase is used in section 1381(a)(2) of the Internal Revenue Code of 1954. More specifically, bylaw V section 3, as amended, will provide that the net income derived from business done with or for members shall belong to and be held for them. The net income of each year derived from business done with or for members shall be distributed to them on the basis of the quantity or value of business done with or for each member. The bylaws also provide that, by obtaining or retaining membership in FTD, its members consent to take into account the stated dollar amount of any distributions made to them in written notices of allocation out of income from their patronage. The effective date of the bylaws is July 1, 1970.

Also, taxpayer anticipates that it will amend its bylaws at its next annual meeting to clarify the fact that, in the event of its liquidation, it will liquidate on a cooperative basis. More specifically, in the event of liquidation, taxpayer will: (1) pay all liabilities, (2) return to the members their membership fees, (3) return to the members the face amount of outstanding patronage equities and (4) distribute the remaining assets to the members on the basis of their past patronage.

Based on the facts presented as enumerated above, we have concluded: (1) that upon the effective date of its new bylaws, FTD will be "operating on a cooperative basis" within the meaning of section 1381(a)(2) of the Internal Revenue Code of 1954 provided it amends its bylaws to provide for liquidation on a cooperative basis and provided that it does in fact operate within the framework of its amended bylaws, (2) that, if taxpayer gives the proper notice to each of its present and future members of the consent bylaw contained in its new bylaws, in accordance with section 1388(c)(2)(B) of the Code and section 1.1388–1(c)(3)(ii) of the Income Tax Regulations, distributions with respect to patronage occurring after the adoption and notice of these bylaws will be deductible by FTD as patronage dividends if they otherwise meet the requirements of sections 1382 and 1388 of the Code as to form and timing.

Notwithstanding the provision in the immediately preceding paragraph concerning amendment of the bylaws with respect to liquidation on a cooperative basis, FTD will be treated as a cooperative as of July 1, 1970, if the amendment pertaining to liquidation is adopted at its next annual stockholder's meeting taking place after the date of this ruling letter and before the last day of its fiscal year ending June 30, 1971.

## OPINION

The primary issue before us is whether members' advances to the Clearing House and Marketing Divisions, respectively, constituted gross income to petitioner. The consequence of

finding that such advances were includable in gross income would be the taxation of the annual increase (advances less expenses) or the deduction of the annual decrease in each of these division accounts. Although the clearing house accounts did increase during each of the years in issue, the marketing accounts sustained aggregate losses in some years. Petitioner reported no income and took no deduction in respect of the foregoing.

Because of the similarity in the basic funding of the two divisions, our determination as to the includability or excludability of the advances will apply to both divisions.

Petitioner's position that the increases in the advance accounts were not taxable is principally grounded on two alternative theories: (1) That it held the advances in trust for the benefit of its members and realized no gross income therefrom and, alternatively, (2) that if such advances were income, then, under the accrual method of accounting, any yearend excess in the clearing house or marketing accounts was offset by the accrual of petitioner's liability to refund to each member the unexpended balance on such member's account.

In support of the trust fund theory, petitioner relies on a series of cases in which it has been held that where a taxpayer reserves funds "which he is obligated to expend in entirety for a specified purpose and no profit, gain, or other benefit is to be received by him in so doing, the funds are not includable in gross income" and are merely held in trust for others. *Ford Dealers Advertising Fund, Inc.,* 55 T.C. 761, 771 (1971) (nonacq. 1974–2 C.B. 5), affd. per curiam 456 F.2d 255 (5th Cir. 1972). See also *New York State Association of Real Estate Boards Group Insurance Fund,* 54 T.C. 1325 (1970) (nonacq. 1974–2 C.B. 5); *Dri-Powr Distributors Association Trust,* 54 T.C. 460 (1970) (nonacq. 1974–2 C.B. 5); *Angelus Funeral Home,* 47 T.C. 391 (1967) (acq. 1969–1 C.B. 20), affd. 407 F.2d 210 (9th Cir. 1969); *Broadcast Measurement Bureau, Inc.,* 16 T.C. 988 (1951) (nonacq. 1974–2 C.B. 4); *Seven-Up Co.,* 14 T.C. 965 (1950) (acq. in result 1974–2 C.B. 4). See further Rev. Rul. 74–319, 1974–2 C.B. 15.

Petitioner contends that it had an obligation to expend advances to the Clearing House and Marketing Divisions only in accord with Bylaw III and that it had a further obligation

to refund unexpended amounts to each member, since, under Bylaw V, such amounts remained the members' property. Respondent does not deny that there were some restrictions on petitioner's use of moneys so collected but takes the position that such restrictions were not narrow enough to impose any meaningful controls on petitioner's disposition thereof. Moreover, respondent seizes upon the infrequency with which actual refunds were paid out (as opposed to credited to members' accounts), other than upon termination of membership, to buttress his assertion that the advances were part of gross income.

Respondent veers away from the fact that petitioner could not apply such advances however it saw fit. Instead, he seems to argue that, because petitioner was not limited to the expenditure of the advances for a single, well-defined purpose, they should be included in gross income. Respondent would have us conclude that, because of the various administrative functions performed by the Clearing House[16] and the Marketing[17] Divisions, petitioner derived some benefit in apportioning the amounts advanced among permissible uses.

We think respondent takes too narrow a view.

Granted that the scope of the uses to which the advances in question could be put is somewhat broader than those which obtained in the cases upon which petitioner relies, we think they were sufficiently restricted to warrant the conclusion that the principles upon which those cases were decided should be applied herein. In our opinion, the scope of the functions performed by the Clearing House and Marketing Divisions did not vitiate the obligations which petitioner had with respect to its members' advances. Nor was there such benefit to petitioner, by reason of the number of permissible uses to which it could apply those advances to trigger income. Cf. *Valley Waste Disposal Co.*, 38 B.T.A. 452 (1938). In *Ford Dealers Advertising Fund, Inc.*, 55 T.C. at 772–773, a case involving advances to the taxpayer from automobile dealers for "advertising," we said that, while the evidence indicated that no restrictions were placed on the type and timing of

---

[16] E.g., clearing of members' order, handling returned checks, handling deficiency accounts.

[17] E.g., advertising, office supplies, promotional materials, etc.

advertising expenditures permitted, the fact was that the funds could only be spent for advertising. The taxpayer's discretion in determining how and when it made advertising expenditures did not convert what were essentially trust funds into income. Moreover, the characterization of such funds as trust funds did not require any specific or express words of trust. See also *Broadcast Measurement Bureau, Inc., supra.* Compare *Krim-Ko Corp.,* 16 T.C. 31, 39–40 (1951). We think petitioner's bylaws and its intent in dealing with its members in respect of the Clearing House and Marketing Divisions established with reasonable certainty the uses to which advances had to be put and sufficed to create a trust.

Petitioner did not realize any gain or profit by reason of its "intermediary" role.[18] See *Ford Dealers Advertising Fund, Inc.,* 55 T.C. at 773–774. Petitioner could not transfer the funds represented by the advances nor any portion thereof to any of its other operations or to its general corporate coffers. Compare *Burley Tobacco Growers Cooperative Association, Inc. v. United States,* an unreported case (E.D. Ky. 1968, 22 AFTR 2d 5146, 68–2 USTC par. 9458). The commingling of advances with each other or with general revenues in a single bank account did not dissolve the trust with which they were impressed. See *Seven-Up Co.,* 14 T.C. at 978. Nor did the fact that yearend excesses in the clearing house and marketing accounts were more often credited to members' accounts, rather than refunded forthwith, dilute petitioner's responsibilities in respect thereof. See *Broadcast Measurement Bureau, Inc.,* 16 T.C. at 997. Whatever "benefit" petitioner may have obtained in virtue of the allocation of a portion of general administrative and overhead expenses to the Clearing House and Marketing Divisions (see n. 5 *supra*) was "incidental and secondary" (cf. *Angelus Funeral Home,* 47 T.C. at 395); such allocation simply represented reimbursement of the costs of operating those divisions and did not constitute

---

[18] The single instance in which petitioner earned unauthorized interest on its clearing house account balance (see n. 8 *supra*), applied such interest to its general revenues, and paid income tax thereon, does not, in our opinion, destroy the character of the advances. Cf. *Ford Dealers Advertising Fund, Inc.,* 55 T.C. 761, 770 n. 1 (1971); *New York State Association of Real Estate Boards Group Insurance Fund,* 54 T.C. 1325, 1335–1336 (1970); *Angelus Funeral Home,* 47 T.C. 391, 395, 397 n. 4 (1967), affd. 407 F.2d 210 (9th Cir. 1969).

"compensation" to petitioner. See *Ford Dealers Advertising Fund, Inc.*, 55 T.C. at 772.

We conclude that the members' advances to the Clearing House and Marketing Divisions were not includable in petitioner's gross income during the taxable years in issue. In view of this conclusion, we need not reach petitioner's alternative argument concerning the offsetting of annual net increases with equal accrued liabilities.[19] We note, however, that the accrued liability theory may be simply the shadow of the trust fund theory.[20] Cf. *Seven-Up Co.*, 14 T.C. at 977. See also *Broadcast Measurement Bureau, Inc.*, 16 T.C. at 1002–1003 (Turner, J., concurring).

Notwithstanding the excludability of the clearing house and marketing advances under the rationale of *Seven-Up Co.*, and its progeny, respondent, relying on *Park Place, Inc.*, 57 T.C. 767 (1972), belatedly argues that petitioner was a cooperative corporation during the years at issue[21] and, therefore, was subject to the provisions of subchapter T of the Internal Revenue Code.[22] Under section 1382 of subchapter T, petitioner's gross income could be adjusted to reflect yearend account increases to the extent that such increases qualified thereunder as patronage dividends paid.

---

[19] Nor need we reach the question of the significance of respondent's prior acceptance of petitioner's consistent method of accounting for such increases as excludable from gross income insofar as it bears on the propriety of petitioner's accounting, a question subsumed in this argument. See *Fort Howard Paper Co.*, 49 T.C. 275, 286–287 (1967).

[20] The two concepts are not necessarily two sides of the same coin, however, e.g., in the case of a cash basis taxpayer. For this reason, where the elements of trust are present, the trust concept would appear to be the preferable interpretative tool.

[21] The first appearance of respondent's cooperative argument is in his trial memorandum. The notice of deficiency simply contained the following statement of respondent's position in respect of the taxability of the clearing house and marketing advances:

"It has been determined that the annual increase in members' funds is includable in the gross income derived from your trade or business as provided in Section 61(a)(2) * * *

* * *

"In the event it is held that Clearing House and the Marketing funds are nontaxable advances from members *held in trust*, then it is determined that so much of those funds, as detailed below [relating to clearing house and marketing receipts from sources other than advances], are not such advances and are, therefore, includable in gross income. [Emphasis added.]"

[22] All Code and section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.

We think it clear that respondent's position alleging petitioner's cooperative status constitutes a new matter as to which the respondent bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. See also *Estate of Floyd Falese,* 58 T.C. 895, 899 (1972). That burden herein involves proof as to both petitioner's cooperative status and nonqualification of account increases as patronage dividends which could have been taken into account in computing taxable income, issues which are factual in nature. Cf. *Puget Sound Plywood, Inc.,* 44 T.C. 305 (1965). Unlike the situation which obtained in *Park Place, Inc., supra,* the record herein is insufficient to permit a determination of these issues. Respondent's bald assertions on brief do not satisfy his burden.[23]

We now turn to respondent's alternative argument, namely, that if such advances were not income to petitioner, then miscellaneous receipts of the Clearing House[24] and Marketing[25] Divisions did constitute income to petitioner. We agree. Unlike members' advances, these moneys were not burdened with restrictions as to disposition. Petitioner's argument that some of these receipts, e.g., clearing house service charges and fines, were only intended to cover the costs relating thereto is of no moment. The fact is petitioner was free to use such receipts as it saw fit.

The real bone of contention between the parties in respect of this issue, however, is the amount of deductible expenses incurred in connection with these receipts. Since the parties have stipulated the amount of miscellaneous receipts and expenses attributable thereto for the Marketing Division and the amount of miscellaneous receipts of the Clearing House, their dispute concerns the amount of total clearing house expenses attributable to that division's miscellaneous receipts consisting of service charges and fines collected in respect of returned checks and delinquent accounts.

---

[23] This conclusion is reached independently of the fact that when petitioner applied to respondent for a ruling deeming it a cooperative for years subsequent to those in issue, respondent conditioned such ruling upon petitioner's amendment of the very bylaw (Bylaw V) now in issue. See p. 343, *supra.*

[24] See pp. 339–340, *supra.*

[25] See pp. 340–341, *supra.*

In presenting the taxability of miscellaneous receipts as an alternative determination in the notice of deficiency, respondent made no allowance for the deductibility of expenses related thereto.[26] On brief, respondent contends that deductible expenses are that fraction of total clearing house expenses that miscellaneous receipts are of total clearing house receipts.

During the years in question, petitioner made no separate allocation of clearing house expenses relating to the processing of returned checks and delinquent accounts. Petitioner alleges, however, that such expenses definitely exceeded miscellaneous receipts. At trial, petitioner introduced testimony of its controller during the years at issue, who was also a certified public accountant, concerning the amount of total expenses allocable to the processing of the returned checks and delinquent accounts. Based upon his knowledge of petitioner's operations and with the assistance of petitioner's independent auditor, he testified that he looked at each expense of the Clearing House for 1970 and estimated what portion thereof, if any, was spent in such processing. He further testified that he then totaled the amount of expenses he deemed attributable to the miscellaneous receipts and determined that $48,926.45 was the cost thereof for that year. Because petitioner had first adopted a more detailed cost accounting system for 1970, its records did not permit the same sort of allocation for prior years.[27] Therefore, the controller, based upon his knowledge that the Clearing House was operated in a similar fashion throughout all of the years in question, determined that the allocable costs for each of the prior years were the same percentage of total clearing house costs (exclusive of those pertaining to petitioner's International Division, see n. 9 *supra*) for such year as the $48,926.45 was of petitioner's 1970 clearing house costs (exclusive of those pertaining to the International Division), or 5.65 percent.

In our judgment, neither petitioner's nor respondent's methodology is reflective of actual allocable costs. Respon-

---

[26] This is because respondent initially deemed all division receipts gross income and all expenses deductible.

[27] Records for prior years did not include as detailed a breakdown of types of Clearing House expenditures.

dent's method of apportionment is insensitive to the additional time and resources expended in the collection process. Petitioner's reconstruction of expenses is a very rough estimate, at best, calculated with the benefit of 20–20 hindsight. Yet, we know some costs were so allocable and we have sufficient evidence to make a determination of the allowable amount therefor. See *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). While we might be inclined, on the basis of the whole record, to find that deductible expenses slightly exceeded fees and fines collected, we simply could not say by how much. Using our best judgment, we determine that the amount of costs allocable to the miscellaneous receipts for each year at issue was the amount taken in as miscellaneous receipts for each such year. In this way, petitioner has realized neither net taxable gain nor deductible loss from its clearing house operation.[28]

One issue remains for our consideration, namely, whether the amount paid by petitioner in settlement of the FNTDN antitrust action was fully deductible against petitioner's gross income for 1968. Both parties argue their positions within the framework of the "origin-of-the-claim" test of deductibility of litigation expenses as such test is articulated in *United States v. Gilmore*, 372 U.S. 39 (1963), and *Woodward v. Commissioner*, 397 U.S. 572 (1970). Petitioner takes the position that, since the lawsuit was generated by the promulgation and enforcement of its membership rules, the settlement expense was properly an expense of its Membership Fulfillment Division. Respondent, on the other hand, argues that the membership rules giving rise to the lawsuit were actually adopted by petitioner's directors in order to protect all of its operations from the impact of FNTDN's members exclusive flower order exchanges[29] and the $150,000 is, therefore, allocable to all of petitioner's divisions so that a portion thereof would be attributed to the Clearing House and

---

[28] In view of the stipulation of the parties (see n. 5 *supra*), the situation may well be different in respect of the allocation of expenses to the miscellaneous receipts of the Marketing Division. This matter can be dealt with in the Rule 155 computation.

[29] In fact, neither the clearing house nor marketing operations apparently suffered by reason of these exclusive exchanges which were passed through petitioner's Clearing House. These divisions only depended upon order quantity for revenue. Basically, the same number of orders would have been exchanged, albeit among a fewer number of florists.

Marketing Divisions funded by members' advances and, consequently, not deductible.

In *Gilmore* and *Woodward,* the issue was whether the taxpayer's litigation expenses were . personal (*Gilmore*) or capital-related (*Woodward*) as opposed to ordinary and necessary business expenses, so as to be subject to an express statutory disallowance.[30] The real question at hand is not *what kind* of expense was incurred; rather, the question is *to which* of petitioner's operations the conceded ordinary and necessary expense represented by the settlement payment should be related. Consequently, we think disposition of the disputed issue herein is governed neither by *Gilmore* nor *Woodward.*

We have already found that petitioner held the Clearing House and Marketing Division advances in a trustee capacity. It could only expend the advances to specified ends. The advances were beneficially owned by the members. Petitioner's trustee role in respect of these operations stood apart from its general corporate identity. Cf. *Dri-Powr Distributors Association Trust, supra.*

The antitrust action was instituted against petitioner for actions taken in its own behalf as a corporate entity in its own right and not as a trustee. The individual members were not defendants. Expenses incurred in connection with such litigation were paid with general corporate funds.

We think the settlement payment was properly taken as an ordinary and necessary business expense of petitioner's general operations. The only authorized expenditures of the clearing house and marketing advances were those necessary for the actual administration of the Clearing House and those necessary for national advertising. Petitioner, as trustee, could not have and, in fact, did not expend such funds in satisfaction of its own general liabilities. Moreover, the issue in the antitrust action did not relate to the *operations* of the Clearing House and Marketing Divisions but to the *eligibility to participate* in those operations.

We are not unmindful of the fact that the advances were applied against a portion of some of petitioner's general

[30] Sec. 265, which disallows any deduction for expenses allocable to tax-exempt income, would not come into play here. Members' advances to the Clearing House and Marketing Divisions were not income to petitioner, exempt or otherwise.

administrative expenses (e.g., directors' and officers' salaries). These expenses, however, were of the type incurred in part in the actual operation of the Clearing House and Marketing Divisions. The same cannot be said of the settlement expense.

*Decision will be entered under Rule 155.*