WILLIAM R. MASSEY AND SCHARLEEN B. MASSEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
MASSEY v. COMMISSIONER
Docket No. 11187-78.
United States Tax Court
T.C. Memo 1982-9; 1982 Tax Ct. Memo LEXIS 739; 43 T.C.M. (CCH) 271; T.C.M. (RIA) 82009; January 11, 1982. *739 Petitioner-husband made advances in 1972 through 1975 on behalf of Y Corporation to pay its creditors pursuant to prior commitments to them. He owned no stock in Y Corporation, but made the commitments to gain it as a client for X Corporation, in which he was a 50-percent shareholder through mid-December 1974, and 100-percent shareholder thereafter, and employed as an engineering and computer consultant. Y Corporation had revenue only in two years of its existence and had no sales after some time in 1974. In 1974 and 1975, Y Corporation was insolvent and any suit by petitioner-husband to recover the advances would have been futile. He claimed deductions for these advances in 1974 and 1975. In the notice of deficiency, respondent disallowed the deductions on the grounds that: (1) it was not established that the debts became worthless and (2) the advances were nonbusiness debt. Held: (1) respondent has not shown that the advances were not debts; (2) petitioners have not shown that the debts were business debts; (3) the debts became worthless in 1974 and 1975. John B. McClane, for the petitioners. Douglas R. Fortney, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND *740 OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners for 1974 and 1975 in the amounts of $ 11,942.23 and $ 3,576.37, respectively. The issues for decision are: [1] (1) whether advances by petitioner-husband to or on behalf of a corporation in which he did not own stock gave rise to debts from that corporation, or constituted contributions to the capital of a corporation in which he did own stock; (2) if the advances gave rise to debts, then whether they were business debts or nonbusiness debts; (3) whether the debts (or the stock, as the case may be) became worthless during either of the years before the Court. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioners William R. Massey (hereinafter *741 sometimes referred to as "Massey") and Scharleen B. Massey, husband and wife, resided in Fort Worth, Texas. In January 1960, Massey went to work for R. S. Woodruff & Associates (hereinafter referred to as "Associates") as an engineer. Associates was a sole proprietorship engaged primarily in consulting in electrical and civil engineering. C. T. McNell (hereinafter sometimes referred to as "McNeel") also was an employee of Associates. In December 1962, Robert S. Woodruff (Associates' owner) died. On April 1, 1963, Massey and McNeel formed a Texas corporation known as R. S. Woodruff & Associates, Inc. (hereinafter sometimes referred to as "Woodruff, Inc."). Initially, Massey and McNeel each paid $ 500 for half of the stock in Woodruff, Inc. Also on April 1, 1963, Woodruff, Inc., purchased Associates' business name, goodwill, and operating assets from the estate and the widow of its deceased owner. [2] *742 From the date of incorporation until 1977, Massey was employed full time as Woodruff, Inc.'s president and general manager. McNeel, a registered public surveyor, was Woodruff, Inc.'s executive vice-president and was the manager of its Pineville, Louisiana, office. In 1965, at Massey's insistence, Woodruff, Inc., rented a computer for about $ 1,000 per month. From the start, McNeel was opposed to the rental and use of a computer. After having paid about $ 105,000 in rent, Woodruff, Inc., purchased the computer by paying an additional $ 36,000. Use of the computer resulted in various operating expenses, including machine supplies, salary for a full-time operator, and time invested by Massey and other company engineers to learn the FORTRAN computer language and to develop programs for the computer. Despite development of computer capacity, Woodruff, Inc., did not have sufficient customers to fully utilize the computer; it was not "paying *743 its way". In 1970 or 1971, Massey met Alton C. Head and a man named Russell (hereinafter sometimes referred to as "Head" and "Russell", respectively). Head operated a proprietorship that built panels, which were used to form portable modules for sale as room additions to mobile homes. Russell held a patent for this process. In early 1971, Massey discussed with Head the possibility of Head's business using Woodruff, Inc.'s engineering or computer services. Head was looking for someone to buy him out or invest in Head's business. McNeel, who remained opposed to the investment in the computer, did not want Woodruff, Inc., to advance any funds to Head's business. In late 1971, Head met with Massey again to ask for financial help because his business equipment was about to be seized and sold. Massey believed that if he helped Head, then Head's business would become a client of Woodruff, Inc., which could generate fees for computer services. Massey believed that, if Head's business would become a good client of Woodruff, Inc., then that would (1) show that Massey was a good manager, (2) help Massey's reputation, (3) make Massey's job more secure, and (4) result in a "profitable *744 relationship" for Woodruff, Inc. In early 1972, Massey agreed to advance his own funds to Head's business and guarantee its debts to various banks and suppliers. As part of this arrangement, Head agreed to incorporate his business and agreed that Massey would be president or serve in some other officer capacity in the corporation until Massey was repaid the funds he advanced. Pursuant to these agreements, Head caused the incorporation of Candleman Manufacturing Company (hereinafter sometimes referred to as "Candleman"). All of the outstanding Candleman stock was owned by Head, who was not related to Massey; Massey was never promised any Candleman stock. From February 1972 to 1976, Massey was a nonsalaried officer of Candleman. Candleman was engaged in the business of developing, manufacturing, and marketing various products which required engineering and management consultation and services which were provided by Woodruff, Inc., primarily through Massey's services. Massey found another place of business for Candleman, at one-fourth the rent that had been charged for its earlier place of business. Massey then lent Candleman funds so that Candleman could obtain the release of its *745 equipment. Initially, Head was plant manager and Russell was sales manager of Candleman. By December of 1972, Russell became uncooperative and moved out of Candleman's office, taking some Candleman property. [3] After that, there were no sales and there was no one making sales for Candleman. In March or April of 1973, Candleman hired Head's friend, Maurice Kline, who handled existing orders efficiently, but failed to make any new sales. By December of 1973, Candleman had to fire Maurice Kline. At that point, Massey looked for a broker to sell Candleman's assets and contacted Allied Management. Allied Management found R. L. Fidler, who instead proposed that he would run Candleman and that he would invest in supplies and payroll for manufacture of additional modules. However, in operating Candleman, R. L. Fidler only ran up bills in Candleman's name, without making any sales. In 1974, R. L. Fidler left. From 1972 through 1975, Candleman had only two years in which it earned revenue, the gross revenue in each of which was about $ 100,000. During that period, Candleman had at *746 most 20 employees. During the years in issue, Massey's trade or business was rendering services as a Woodruff, Inc., employee and his primary source of income was compensation received as Woodruff, Inc.'s employee. The annual amount paid to Massey by Woodruff, Inc., for its fiscal years 1970 through 1977 is indicated in table 1. Table 1 Fiscal Year
Ended February
Amount
1970
$ 34,971
1971
20,300
1972
52,870
1973
73,600
1974
42,000
1975
67,840
1976
47,585
1977
31,921 During the years in issue, Woodruff, Inc., provided engineering and computer services to various clients and Candleman was a substantial customer of Woodruff, Inc. During these years, Candleman was in a position of insolvency and able to continue in business only because Massey continued to advance funds to satisfy the creditors (banks and suppliers). For each of the years 1972 through 1975, the amount Massey advanced to Candleman is the amount shown in table 2 in the credit column less the amount shown in the debit column. The amounts in these two columns are derived from Candleman's general journal. Table 2 Deducted [1] *747 by
Year
Debit
Credit
Petitioners
Balance
1972
$ 3,500.00
$ 53,500.00
$ 42,000.00
$ 8,000.00 1973
2,620.88
39,648.73
33,500.00
11,527.85 1974
868.74
38,658.38
49,317.49
1975
2,864.00
17,112.11
14,285.93
(37.82)
In addition, Massey advanced $ 7,217.75 in 1976. Massey made the 1974 and 1975 advances to Candleman because of his prior commitments to the creditors and his hope that Candleman would regain its solvency. Were Candleman to go bankrupt or cease buiness during the years in issue, it would have had an adverse impact on Woodruff, Inc.'s businsss and revenues. After R. L. Fidler left in 1974, Candleman had no sales, and by 1975 its machinery and equipment had been sold. Candleman paid Woodruff, Inc., $ 1,814.82 between February 22 and May 23, 1972. Unpaid accrued fees due Woodruff, Inc., from Candleman for 1972 through 1974 totalled $ 30,564.58, and were never paid. Candleman was insolvent in 1974 and 1975 and any suit by Massey to collect amounts owed to him by Candleman would have been futile. The gross revenues of Woodruff, Inc., grew steadily from $ 54,000 in 1963 to a peak of $ 667,000 in 1974, but dropped off in 1975; in 1977 they were between $ 400,000 and $ 500,000. From 1970 on, the annual computer service fees never *748 exceeded $ 12,000. During 1970 through 1975, Woodruff, Inc., employed about 40 people, 10 of whom were engineering personnel and the balance were clerical and surveying personnel. Massey owned half of the outstanding stock of Woodruff, Inc., from 1963 to December 16, 1974, when he purchased the remaining half from McNeel for $ 145,362--about half of the retained earnings amount shown on Woodruff, Inc's balance sheet. Between December 16, 1974, and 1977, Messey paid approximately $ 60,000 pursuant to the stock purchase agreement with McNeel. In early 1977, both Massey personally and Woodruff, Inc., went into bankruptcy. Following the bankruptcy of Woodruff, Inc., Massey received one job offer; that was at an annual salary of $ 15,400. Massey was at all times relevant to this case a cash-basis taxpayer. Candleman's debts to Massey became worthless in 1974 and 1975. OPINION Petitioners maintain that the amounts Massey advanced to Candleman gave rise to debts created in connection with his trade or business, which became worthless in 1974 and 1975. They maintain that these amounts are deductible in the years in issue as business bad debts under section 166. [4] *749 Respondent contends that Massey's advances constitute contributions to the capital of Woodruff, Inc. As part of this contention, he asserts that "[t]he advances deducted in 1974 and 1975 should not be considered bona fide debt (business or nonbusiness) since the petitioners could not justifiably expect repayment." Alternatively, respondent contends that even if we consider Massey's advances to be "bona fide debts", they are nonbusiness debts under section 166(d)(2). Additionally, he argues that Massey's advances did not become worthless until 1977 (if they were contributions to Woodruff, Inc.'s capital) or 1976 (if they were debts from Candleman). We agree with petitioners that respondent has not shown that the amounts advanced by Massey were not debts. See p. 12, infra. We agree with respondent that petitioners have not shown that Massey's dominant motivation in creating the debts was proximately related to Massey's trade or business as Woodruff, Inc., employee. We agree with petitioners that the debts to Massey became worthless in 1974 and 1975. *750 Section 166(a) allows deductions for worthless debts. [5] However, under section 166(d)(1) [6] *751 a nonbusiness bad debt is deductible by an individual only as a short-term capital loss. The instant case involves three elements: viz. (1) contribution to capital [7] versus debt; (2) if debt, then business versus nonbusiness; and (3) year of worthlessness. A. Contributions to Capital versus Debts The question of whether the advances are debt or contributions to capital is one of fact. E.g., Dorminey v. Commissioner, 26 T.C. 940, 946 (1956). In the usual situation as to such factual matters, the taxpayer would bear the burden of proof; in the instant case respondent concedes that his capital contribution contention constitutes "new matters", as to which he bears the burden of proof. Estate of Emerson v. Commissioner, 67 T.C. 612, 620 (1977); *752 Florists' Transworld Delivery Assn. v. Commissioner, 67 T.C. 333, 348 (1976); Rule 142(a), Tax Court Rules of Practice and Procedure.
Although Candleman was in a position of insolvency during 1974 and 1975, the parties have stipulated that Massey's payments were made because of prior commitments by him to the creditors. Under such circumstances, the determination of whether a payment by a guarantor gives rise to a bona fide debt is to be made looking at the facts at the time the guaranty is made, not when the guarantor is called upon to make payment. See Putnam v. Commissioner, 352 U.S. 82, 85-86, 88-89 (1956); Arrigoni v. Commissioner, 73 T.C. 792, 799-800 (1980), and cases there cited. Massey testified that the prior commitments or guaranties were made before the years in issue in order to make Candleman a viable client for Woodruff, Inc. No evidence was presented which would indicate that Massey expected to be called upon to pay without reimbursement because of his guaranties at the time the guaranties were given. See Roussel v. Commissioner, 37 T.C. 235, 242-243 (1961). No evidence was presented that there was any defect in the forms or legal effectiveness of Massey's guaranties. *753 We conclude that respondent has failed to bear his burden of proving that Massey's advances constituted contributions to the capital of Woodruff, Inc., and did not give rise to debts from Candleman to him. On this issue, we hold for petitioners. B. Business versus Nonbusiness Debt Under section 166(d)(2), [8] the debts to Massey are nonbusiness debts, unless they were acquired in connection with, or became worthless in, Massey's trade or business. Respondent's determination in the notice of deficiency that the debts were nonbusiness is presumed to be correct and petitioners bear the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In order to prevail, petitioners must show a proximate relationship to Massey's trade or business. Whipple v. Commissioner, 373 U.S. 193, 201 (1963); *754 sec. 1.166-5(b), Income Tax Regs. The "proper measure [for such a relationship] is that of dominant motivation." United States v. Generes, 405 U.S. 93, 103-105 (1972); Shinefeld v. Commissioner, 65 T.C. 1092, 1096 (1976).
The parties stipulated that during the years in issue Massey's trade or business was rendering services as a Woodruff, Inc., employee, which, in turn, generated his primary source of income, his compensation as an employee. Massey was also a 50-percent shareholder in Woodruff, Inc., from 1963 through the end of 1974, and a 100-percent shareholder thereafter. At the time he made the prior commitments for Candleman, Massey believed that it would become a client of Woodruff, Inc., with demand for its computer services. For Massey to treat his advances as business bad debt, petitioners must show us that Massey's dominant motivation in making commitments for Candleman was proximately related to his status as an employee of Woodruff, Inc., rather than as an investor in Woodruff, Inc. United States v. Generes, supra; Benak v. Commissioner , 77 T.C.     (December 7, 1981); Shinefeld v. Commissioner, 65 T.C. at 1097-1099; Estate of Byers v. Commissioner, 57 T.C. 568, 577-578 (1972), *755 affd. 472 F.2d 590 (CA6 1973). The fact that a loan or payment is made in furtherance of an employer's trade or business does not mean that it is proximately related to that of the employee. Benak v. Commissioner, supra; Shinefeld v. Commissioner, supra.Cf. Brehouse v. Commissioner, 37 T.C. 326, 330 (1961), which involved members of a partnership. Massey testified that Woodruff, Inc.'s gaining a client in Candleman would by definition result in profit for the former. Although vague, Massey's testimony also indicated that his $ 145,362 stock purchase agreement with McNeel was based on half of the value of the net assets of Woodruff, Inc., at the end of 1974. This combined with the gross revenues of Woodruff, Inc., raises the probability that Massey had a significant investment interest in that company as a shareholder. On this record, petitioners have failed to prove Massey's dominant motivation in making the commitments to Candleman was his business as an employee of Woodruff, Inc., as distinct from his enhancement of his investment interest as shareholder in Woodruff, Inc. See Shinefeld v. Commissioner, supra; Imel v. Commissioner, 61 T.C. 318 (1973); Estate of Byers v. Commissioner, supra.
We *756 conclude that petitioners have failed to bear their burden of proving that Massey's dominant motivation in making commitments to Candleman stemmed from his trade or business as a Woodruff, Inc., employee, rather than his role as a Woodruff, Inc., investor. Petitioners argue that Massey's dominant motives were concern for his position in Woodruff, Inc., as a salaried employee and his business reputation as an engineer and business manager. The record presents us with several motives behind Massey's commitments, including his desire to keep Woodruff, Inc., a viable entity. We are unable to conclude that any of the motives presented as they relate to Massey as a Woodruff, Inc., employee was the dominant one behind the advances. See Shinefeld v. Commissioner, 65 T.C. at 1099. Petitioners rely on a number of cases concluding that advances or guaranties were business bad debts where they were made to protect the taxpayer's salary or business reputation. We do not find the holdings of any of those cases to be applicable given the factual context and record in the instant case. On this issue we hold for respondent. C. Year of Worthlessness Respondent does not contend that any of the *757 debts in dispute became worthless before 1974--the earlier year before the Court. Respondent concedes (and we have so found) that Candleman was insolvent in 1974 and 1975 and any suit by Massey to collect amounts owed to him by Candleman would have been futile. Respondent has not dispelled the appearance of a conflict between his assertions on the year of worthlessness issue and his assertions on the contributions to capital contention, discussed supra. See Brenhouse v. Commissioner, 37 T.C. at 329. We conclude that the debts became worthless in 1974 and 1975. See table 2, supra for the amounts and years of deductions. On this issue, we hold for petitioners. Decision will be entered under Rule 155. Footnotes
1. Respondent's adjustment increasing the charitable contribution deduction for 1974 is solely derivative; its resolution depends on petitioners' adjusted gross income for that year (subpars. (A) and (E) of sec. 170(b)(1)) and, in turn, on the resolution of the issues presented by the parties.↩
2. Woodruff, Inc., agreed to pay the widow (individually and as independent executrix of the estate) $ 162,000 for Associates' name, goodwill, and operating assets by means of its 30-year note, with monthly payments of $ 450. On February 26, 1963, Massey and McNeel entered into a contract with the widow to buy Associates' office furniture, fixtures, and engineering equipment for $ 9,000. It is not clear whether this agreement was in addition to the April 1, 1963, 30-year agreement or whether it was subsumed in the latter agreement.
3. There is no indication in the record as to whether Russell attempted to regain control over the patent.↩
1. The parties have not explained the differences between the amounts deducted by petitioners and the amounts stipulated as having been advanced in the years in issue.
4. Unless otherwise indicated, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.
5. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. [The subsequent amendment of this provision by section 1906(b)(13)[sic](A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1834, does not affect the instant case.] ↩
6. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) Subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. [The subsequent amendments of this provision by paragraphs (1)(A) and (2) of section 1402(b) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1731, 1732, do not affect the instant case.]
7. If we were to agree with respondent that the advances in issue were contributions to capital of Woodruff, Inc., the character of the deduction on worthlessness would be controlled by section 165(g), which provides that there would be a capital loss. (See sec. 166(e).) Because we have concluded that respondent failed to show that the advances were not debts, section 165 is inapplicable.↩
8. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts.-- (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩