MARCUS CONANT AND ANNE L. CONANT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Conant v. Commissioner
Docket Nos. 12605-79, 1411-81.
United States Tax Court
T.C. Memo 1986-415; 1986 Tax Ct. Memo LEXIS 197; 52 T.C.M. (CCH) 377; T.C.M. (RIA) 86415; September 3, 1986. *197 From 1974 through 1976, petitioner-husband's primary business was as a Texaco consignee; he was also an officer, an employee, and a shareholder of three corporations -- EASI, CAN DO, and ECO-REZ. These corporations were operated separately from each other and were not related to petitioner-husband's business as a Texaco consignee. In 1974, petitioner-husband guaranteed a note on behalf of EASI and a note on behalf of ECO-REZ. Neither of these corporations paid the notes. Petitioner-husband made payments on account of these guarantees. From 1974 through 1976, petitioner-husband made expenditures on behalf of the three corporations. CAN DO was dissolved in 1976. In 1976, petitioners did not report any dividend income from Santa Fe Fuels, Inc. Held: (1) Petitioner-husband's 1974 and 1975 payments on account of his guarantee of the EASI note gave rise to nonbusiness bad debts, deductible as short-term capital losses for the years in which the payments were made. Sec. 166(d), I.R.C. 1954. (2) Petitioner-husband's 1976 payments on account of his guarantee of the ECO-REZ note gave rise to business bad debts, deductible in full against gross income for 1976. Sec. 166(a), I.R.C. 1954. *198 (3) Petitioner-husband's expenditures on behalf of EASI, CAN DO, and ECO-REZ were contributions to the capital of the respective corporations. (4) Petitioners are entitled to a 1976 long-term capital loss deduction for petitioner-husband's contributions to CAN DO's capital. (5) Petitioners failed to prove (a) that they are entitled to deduct items that respondent had disallowed as personal or unverified, and (b) that they had no dividend income from Santa Fe Fuels, Inc. (6) Liability determined for additions to tax under sec. 6653(a), I.R.C. 1954, for 1974, 1975, and 1976. Thomas G. Christmann, for the petitioners. Avery Cousins, III, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under section 6653(a)[1] (negligence, etc.) against petitioners as follows: Docket No.
Year
[2] *199 Deficiency Additions to Tax Sec. 6653(a)
12605-79
1974
$9,269.88
$463.49
1975
7,585.83
379.29 1141-81
1976
11,717.97
585.90 These cases have been consolidated for trial, briefs, and opinion. After concessions by respondent, the issues for decision are as follows: (1) Whether petitioners are entitled to deduct their claimed Schedule C business expenses for 1974, 1975, and 1976; (2) Whether petitioners received unreported dividend income in 1976; and (3) Whether petitioners are liable for an addition to tax under section 6653(a) for each of the years in issue. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, Marcus Conant (hereinafter sometimes referred to as "Conant") and Anne L. Conant, husband and wife, resided in Gainesville, Florida. During the 1930's, Conant was an employee of the Internal Revenue Service (hereinafter sometimes referred to as "the IRS"). When Conant left the IRS he was chief of an audit section. Conant had been in the United States Army (or Army Reserves) for 27 years; during *200 World War II, he spent 42 months overseas. During the years in issue, Conant was a retired military officer and he received a pension for his service in the United States Army. In 1945, Conant became involved with dredges. In the late 1960's, Conant started building an 8-inch dredge. He had this dredge throughout the 1970's. Conant maintained a shop in his garage at home; he had lathes, grinders, and welders. In the shop, Conant was developing an improved cutter head for a dredge, and a model of a bomb shelter. Conant applied for a patent on his bomb shelter. From 1974 through 1976, Conant's primary business was as a Texaco consignee, operating from offices in Gainesville, Florida. As a Texaco consignee, Conant sold Texaco products for commission. Texaco would assist an individual in establishing a service station by financing 90 percent of the cost of a service station and the land. Conant believed that if he had a piece of land dredged and traded it for a service station site then he could receive a 100-percent mortgage on the property. From 1974 through 1976, Conant also was an employee, officer, and shareholder of the following three corporations: (1) Environmental Aquatic *201 Services, Inc. (hereinafter sometimes referred to as "EASI"); (2) CAN DO, Inc. (hereinafter sometimes referred to as "CAN DO"); and (3) ECO-REZ, Inc. (hereinafter sometimes referred to as "ECO-REZ"). Each of these corporations was operated separately from the others and was not related to Conant's business as a Texaco consignee. Background -- EASI
EASI was incorporated on November 15, 1971. EASI was authorized to issue 100 shares of common stock, par value $5. The original shareholders of EASI were Arthur E. Barrett (hereinafter sometimes referred to as "Barrett"), EASI's president, and Paul B. Drewing (hereinafter sometimes referred to as "Drewing"), EASI's secretary/treasurer; each shareholder had 20 shares of stock. In January 1973, Drewing transferred his EASI stock to First National Bank of Florida as collateral against a $2,000 loan; these 20 shares were later retired. In January 1973, Conant became office manager/director/treasurer of EASI and bought 20 shares of stock. In late 1973, Sherill Alesi (hereinafter sometimes referred to as "Alesi"), became secretary of EASI. Alesi did not own EASI stock. Conant's job with EASI was to manage all EASI funds. Barrett was responsible *202 for soliciting work for EASI, checking that the work was done properly, and maintaining EASI's equipment. Initially, Conant maintained all of EASI's records in Gainesville. However, sometime in 1973 or 1974, Conant turned over most of the recordkeeping duties to Alesi, who lived in Georgia. While Conant initially controlled EASI's checking accounts with ComBank/Pine Castle, Pine Castle, Florida, the First National Bank of Gainesville (hereinafter sometimes referred to as "First Bank"), and the Florida National Bank of Gainesville, the actual check-writing duties were for the most part transferred to Alesi in 1973. In 1973, Conant advanced more than $6,000 to EASI. Federal employment tax Forms 941 were filed for EASI for the years in issue. A corporate tax return Form 1120 was filed for EASI on June 18, 1973, for the calendar year 1972. There is no record of any further corporate tax return filing by EASI. EASI failed to make Federal income tax withholding and Social Security payments to the IRS for the period of September 30, 1973, through March 31, 1975. The IRS considered Conant responsible for the lack of payments, and garnished $4,142.33 of his military retirement pay. *203 On September 5, 1979, Conant filed a refund claim for the $4,142.33. EASI was apparently dissolved in 1977 and reinstated in 1979 to pursue some lawsuits. [3]
Background -- CAN DO
CAN DO was incorporated by Conant in Florida about 1946 in order to operate dredges and earth-moving equipment. CAN DO was owned solely by Conant. At one time, CAN DO performed services for Conant's Texaco distributorship by fixing service stations and repairing pumps. Because of the high-risk nature of the work, Conant used the corporate form to limit his exposure to liability.CAN DO was dissolved in 1976. Background -- ECO-REZ
ECO-REZ was apparently incorporated in New York in 1974. The incorporators were Harry Trussell (hereinafter sometimes referred to as "Trussell"), Trussell's wife, and Conant. Trussell and Conant each had a 50-percent interests in ECO-REZ. ECO-REZ's officers were Conant (president), Trussell (Treasurer), and Trussell's son, Carrie (secretary). The business was intended to recycle various waste plastic/vinyl materials into reuseable vinyl resins, which in turn could be used as raw materials for producing *204 finished products. Conant's Activities Apart From His Business as a Texaco Consignee
In 1973, Conant and Barrett arranged to purchase a 10-inch dredge from a man named Taylor for about $20,000. When the deal was made, Conant and Barrett each paid Taylor about $2,500. Conant contributed has interest in the dredge to EASI. The dredge was to be used at Lake Wicata, Florida; the dredging job was halted because a State Dredging permit was not obtained. EASI received $15,000 for the work performed. In 1973, Conant loaned Barrett some money. [4] Petitioner Anne L. Conant was concerned about the financial stability of both Barrett and EASI. She made Conant promise to have no further dealings with Barrett and EASI. Conant continued his business relationship with Barrett and EASI because he wanted his money back. In August 1973, Barrett told Conant that EASI was to be sold for $300,000 to AMAX Resources Recovery, Inc. (hereinafter sometimes referred to as "AMAX"), a wholly-owned subsidiary of AMAX, Incorporated. Thereafter, Barrett took all of Conant's EASI accounting records. The sale of EASI to AMAX was to be made in January 1974 *205 and then Barrett was to work for AMAX. Barrett told Conant that AMAX was developing a product to neutralize military radar. Conant related this information to the Federal Bureau of Investigation (hereinafter sometimes referred to as "the FBI"). After about 2 years, the FBI informed Conant that the files on the case were destroyed. The sale of EASI to AMAX never took place; instead EASI sold only the 10-inch dredge to AMAX. Conant did not receive any of the proceeds from this sale to AMAX. Taylor sued Conant to recover the outstanding debt owed to Taylor on the purchase of the 10-inch dredge. After Conant told Taylor that he had contributed his interest in the dredge to EASI, Taylor amended his suit to include EASI. In September 1973, Conant leased his 8-inch dredge for use on a dredging job in Smyrna, Georgia. The dredge was moved to the site. Conant never received any money for the use of his dredge; he even had difficulty in having his dredge returned. In 1974, Conant guaranteed a note on behalf of EASI to First Bank. [5] EASI did not repay the note and, in 1974 and 1975, petitioners paid $7,871.58 and $10,337.43, respectively, on account of Conant's guarantee on the note for *206 EASI. [6]
On February 23, 1974, Trussell visited Conant at Conant's "bulk plant". Trussell indicated to Conant that he wanted to remove all of the equipment from a compost plant in Gainesville, Florida. Conant assisted Trussell by sending a machine to help move some of the equipment from the compost plant. Thereafter, Trussell contacted Conant to see if Conant could obtain some benzene for use by Allied Polymer, a corporation in Swainesborough, Georgia. If benzene were combined with other materials in Allied Polymer's molding injection machines, then perhaps a marketable product could be produced. At the time, Allied Polymer was suffering some financial difficulties; it had an insufficient supply of raw materials to operate. During 1974, benzene was in limited supply in the United States. Conant contacted his son, a Texaco sales manager in Ireland, about the availability of the chemical. Based on his son's advice, in May 1974, Conant went to Ireland and made arrangements to purchase some benzene. On his return from Ireland, Conant was informed by *207 Texaco that benzene was too dangerous to ship; instead Texaco suggested that a styrene monomer be substituted. The arrangement was that Conant would supply Allied Polymer with the chemical through his Texaco consignee business; Conant would receive a commission on the sales to Allied Polymer. Conant estimated that he would receive a minimum of $10,000 in commission from the sale of the chemicals to Allied Polymer. There was also some discussion that ECO-REZ and Allied Polymer would form a joint operation to produce the product. While Conant was in Ireland in 1974, Allied Polymer issued about $70,000 in bad checks, drawn on the Citizens Bank of Swainesborough (hereinafter sometimes referred to as "the Citizens Bank"). When Conant returned, he became involved with Allied Polymer's financial problems. Later that year, Conant arranged that ECO-REZ would borrow $72,000 from the Citizens Bank, with the note guaranteed by Conant, Trussell, and another individual. Conant guaranteed the note because he believed that Allied Polymer was worth saving. Conant and Trussell also arranged that Allied Polymer's accounts receivable were to be assigned to them, and then factored to provide additional *208 funds for the corporation. It was intended that ECO-REZ would assist Allied Polymer directly with its financial difficulties. However, instead of ECO-REZ receiving the $72,000, the money was placed directly into Allied Polymer's bank account, which was used to pay the checks Allied Polymer had previously issued. Conant also became Allied Polymer's treasurer. After several weeks, he resigned when he learned that Allied Polymer's past failure to pay withheld Social Security taxes to the IRS in a timely manner placed the treasurer personally at risk. By a letter dated July 25, 1974, Allied Polymer ordered from Conant, 40,000 gallons of liquid styrene monomer to be delivered each month for the rest of the year. After receiving the letter, Conant contacted Allied Polymer to confirm the order; at this time Allied Polymer informed Conant that it was intending to purchase the chemical for resale purposes. Conant became upset and he refused to supply Allied Polymer with the chemical. The $72,000 note to the Citizens Bank was not repaid. The Citizens Bank sued Conant, as one of the guarantors on the note. [7] The Citizens Bank won a judgment and levied on some of the commission checks Conant *209 received from Texaco. In 1976, the Citizens Bank received $3,987.40. [8] The judgment was appealed on numerous occasions and finally Conant received a release from the Citizens Bank for the remainder of the debt. Conant's attorney's fees exceeded $30,000. On or about October 20, 1974, William J. Duerr and his wife, Doris Ann Duerr, entered into a joint venture agreement with Trussell for the purpose of consolidating and developing their joint interests in the solid and liquid waste industry. On January 6, 1975, Trussell, as president of Tech Rand Associates of Georgia, Inc. (hereinafter sometimes referred to as "Tech Rand"), entered into a contract with Richard E. Brown (hereinafter sometimes referred to as "Brown"), wherein Brown agreed to supervise the disassembly of two compost plants *210 owned by Tech Rand, located in Gainesville and St. Petersburg, Florida. The contract was never carried out and Conant handled the disassembling and the shipping of the compost plant located in Gainesville. Conant did not receive any money for his services. On February 5, 1975, Conant loaned $15,000 to Eugene F. Vickery (hereinafter sometimes referred to as "Vickery") to do a dredging job in Stuart, Florida. Vickery also leased some equipment from Conant and CAN DO for this job. The dredge used on the job was leased from someone other than Conant and CAN DO. Vickery never repaid any money to Conant. Conant did not sue Vickery. In 1976, Barrett was using a 6-inch dredge, owned by EASI, on the Chattahoochee River. Someone cut the dredge loose and it floated down the river. Conant loaned some money to Barrett to enable Barrett to retrieve the dredge. [9]
In 1974, 1975, and 1976, Conant made some expenditures on behalf of EASI and ECO-REZ. In 1974 and 1976, Conant made some expenditures on behalf of CAN DO. The expenditures were made to pay debts of the corporations, to keep the corporations continuing as *211 going concerns, and to protect Conant's capital investments in the corporations. The corporations did not require Conant to make the expenditures. The corporations did not pay any amounts to Conant on account of these expenditures. Conant never sued for reimbursement of the expenditures made on behalf of the three corporations. No loan documentation was ever prepared evidencing the expenditures to be loans from Conant to the respective corporations. Conant never received any income from EASI, CAN DO, or ECO-REZ. The Tax Returns
On their tax returns for 1974, 1975, and 1976, petitioners reported Schedule C net losses of $8,469.65, $10,524.27, and $13,112.65, respectively. For 1974, respondent made adjustments to the Schedule C as listed in table 1, resulting in a net profit of $29,576.42. Table 1
Per Return
Adjustments
Gross receipts Less Returns
And Allowances
$96,249.40 Cost of goods sold: Cost of labor
21,671.00 ($ 912.84)
Materials & supplies -
shop expense
3,283.06 (1,687.13)
Other costs - bulk plant
& station expense
15,047.44 322.06 Total cost of goods sold
$40,001.50 ($ 2,277.91)
Gross profit
$56,247.90 $2,277.91 Deductions: Depreciation
6,481.68 $ (1,780.00)
Taxes
9,802.67 (4,078.16)
Rent
2,531.62 (2,434.56)
Utilities
3,418.20 (2,052.77)
Insurance
4,511.75 (1,513.84)
Legal & professional fees
5,581.65 (5,581.65)
Truck expense
14,987.60 (6,038.54)
Travel & entertainment
4,617.64 (3,838.38)
Interest expense
2,237.74 (1,126.22)
Equipment rental
5,577.47 (5,550.96)
Office expense
2,180.34 (859.99)
Advertising and promotion
1,486.49 (750.23)
Freight
337.30 (162.86)
Postage
965.40 Total deductions
$64,717.55 ($35,768.16)
Net profit or (loss)
($8,469.65)
$38,046.07 *212 Respondent determined that petitioners are entitled to treat the following as 1974 short-term capital losses: (1) $7,871.58 paid by Conant to First Bank on account of Conant's guarantee on a note from EASI; [10] and (2) $28,123.97 paid by Conant on behalf of EASI ($10,244.63), CAN DO ($7,318.17), and ECO-REZ ($10,561.17), and included in the "Adjustments" column of table 1, supra. [11]
For 1975, respondent made adjustments to the Schedule C as listed in table 2, resulting in a net profit of $22,499.11. Table 2
Per Return
Adjustments
Gross receipts Less Returns
And Allowances
$91,964.64 Cost of goods sold: Cost of labor
23,389.50 Materials & supplies -
truck expense
11,714.22 ($1,956.04)
Other costs - bulk expense
2,433.55 (872.87)
Total cost of goods sold
$37,537.27 [12] ($2,828.91)
Gross profit
$54,427.37 $ 2,828.91 Deductions: Depreciation
9,065.68 (3,157.00)
Taxes
10,401.27 (4,588.79)
Rent
3,111.23 (538.70)
Repair (shop expense)
2,846.66 (848.58)
Insurance
5,431.55 (1,035.55)
Legal and professional fees
8,988.62 (7,617.62)
Utilities
4,474.78 (1,818.00)
Interest
2,308.25 (111.31)
Station expense
3,565.33 (1,183.09)
Travel and entertainment
4,484.20 (3,755.96)
Office expense
2,691.80 (1,357.66)
Advertising and promotions
2,314.75 (1,014.74)
Postage and freight
1,133.77 (146.12)
Equipment rental
4,133.75 (3,021.45)
Total deductions
$64,951.74 ($30,194.57)
Net profit or (loss)
($10,524.37)
33,023.48 *213 Respondent determined that petitioners are entitled to treat the following as 1975 short-term capital losses: (1) $10,337.43 paid by Conant to First Bank on account of Conant's guarantee on a note from EASI; and (2) $12,364 paid by Conant on behalf of EASI ($2,749.07) and ECO-REZ ($9,614.93), and included in the "Adjustments" column of table 2, supra. (See n. 11, supra.) For 1976, respondent made adjustments to the Schedule C as listed in table 3, resulting in a net profit of $26,690.61. [13]
Table 3
Per Return
Adjustments
Gross receipts
$47,124.96 Less: Returns and allowances
3,987.40 $ (3,987.40)
Total income
$43,137.56 [14] $ 3,987.40 Deductions: Depreciation
3,765.00 (538.00)
Taxes
807.56 (237.45)
Rental
2,865.25 (2,865.25)
Repair
965.96 (965.96)
Salaries
8,399.00 -0-
Insurance
1,439.51 (564.16)
Legal and Professional fees
4,450.95 (4,431.10)
Utilities
3,058.10 (1,720.80)
Interest
1,107.21 177.76 Bad debts
750.00 (750.00)
Freight
2,038.31 (1,424.08)
Station Expense
1,799.27 (1,200.31)
Bulk plant
1,692.25 (565.71)
Travel and entertainment
9,290.90 (9,164.90)
Truck expense
3,345.13 (1,659.13)
Office
734.64 (705.63)
Promotional
453.46 (378.46)
Postage
633.00 (168.00)
Equipment rent
8,654.71 (8,654.71)
Total deductions
$56,250.21 ($35,815.89)
Net profit or (loss)
($13,112.65)
$39,803.29 *214 For 1976, respondent did *215 not determine that any of the disallowed Schedule C business expenses are deductible as shortterm capital losses. Petitioners did not report any capital gains or losses on their 1974 and 1975 tax returns. On their 1976 tax return, petitioners reported net short-term capital gains of $398.79 [15] and net long-term capital gains of $353.70. [16] Of the eight capital assets sales petitioners reported on their 1976 tax return, three were of assets acquired in 1974, four were of assets acquired in 1975, and one was of an asset acguired in 1976. Respondent examined petitioners' tax return for 1973. Respondent audited only some of petitioners' expenses; it was determined that petitioners owed an additional $184 in income taxes. Although petitioners claimed large deductions on their tax returns for 1974, 1975, and 1976, petitioners did not maintain adequate records and as a result, at trial, they were incapable of substantiating some of their claimed deductions. * * * Petitioners were negligent in failing *216 to keep adequate records, and this negligence resulted in at least part of their underpayments for 1974, 1975, and 1976. During the years in issue, Conant was in the trades or businesses of being a Texaco consignee, and of being an officer and employee of EASI, CAN DO, and ECO-REZ. During the years in issue, Conant was not involved in any joint venture or co-venture with any corporation. Apart from Conant's payments on account of his guarantees, Conant's expenditures on behalf of EASI, CAN DO, and ECO-REZ were not loans to the corporations. Apart from Conant's payment on account of his guarantee of the ECO-REZ note, Conant's expenditures on behalf of EASI, CAN DO, and ECO-REZ were not related to Conant's trades or businesses or his income-producing activities. Conant's attempt to provide Allied Polymer with benzene and styrene monomer was an activity of Conant's business as a Texaco consignee. Conant's guarantee of ECO-REZ's note to the Citizens Bank was part of this activity. The debt from ECO-REZ to Conant that arose when the Citizens Bank levied on some of Conant's Texaco commission checks was a debt created in connection with Conant's trade or business as a Texaco consignee. OPINION *217 I. Schedule C Business Expenses -- 1974-1975
Respondent maintains that for 1974 and 1975, the disallowed Schedule C business expenses (apart from those disallowed as personal or unverified) -- should be deductible only as non-business bad debts under section 166(d) of the Internal Revenue Code of 1954. As such, they would be treated as short-term capital losses and be deductible only in the taxable year in which they became worthless (and only in the amount of $1,000 per year for the years 1974, 1975 and 1976). I.R.C. § 166(d)(1)(B). This short-term capital loss treatment was given by respondent to the claimed deductions relating to the corporations which clearly had become losses during the 1974 and 1975 years, and was also the reason respondent modified its asserted tax deficiency for the 1976 year so as to allow petitioners a $1,000 short-term capital loss carryover for that year as well. Petitioners maintain that the expenses disallowed by respondent for the years in issue should be deductible under section 162, section 212, section 166, or section 165. We agree in general with respondent's conclusion that petitioners are entitled to a short-term capital loss deductible against *218 gross income to the extent of $1,000 for 1974 and 1975. As a preliminary matter, it is important to determine what trades or businesses Conant carried on [17] during the years in issue. The term "trade or business" is not defined in section 162.[18]Green v. Commissioner,74 T.C. 1229, 1234-1235 (1980). Although various factors have been considered in determining whether a taxpayer's activities are a trade or business, each of these factors is only a guide and no one factor is conclusive. Higgins v. Commissioner,312 U.S. 212, 217 (1941); Green v. Commissioner,74 T.C. at 1235, and cases there cited. We have found, that from 1974 through 1976, Conant was in the trades or businesses of being a Taxaco consignee, and of being *219 an officer and employee of EASI, CAN DO, and ECO-REZ. Petitioners contend that Conant was also in the trades or businesses of being an independent dredge operator, and dredge lessor, a compost plant disassembler, an inventor, and "a coventurer in these capacities with the corporations". We disagree. Viewing the record as a whole, we are convinced that during the years in issue, Conant did not carry on any of these other trades or businesses as petitioners contend. Although we reach this conclusion on the basis of the entire record, there are several factors which deserve brief discussion. Firstly, EASI, CAN DO, and ECO-REZ were separate corporate entities. More important, each of the corporations was separate from Conant. Conant was not in the trades or businesses of the corporations. This separation is as true of CAN DO, which Conant incorporated and owned entirely, as it is of EASI and ECO-REZ, where Conant was one of several shareholders. Conant incorporated CAN DO to engage in dredging and earth-moving work in order to limit his personal liability in these high-risk activities. Conant testified that the dredging work he did during the years in issue was done through CAN *220 DO. Conant's personal involvement in these activities through CAN DO does not cause these activities to become Conant's trades or businesses, rather than CAN DO's trades or businesses. Respondent has conceded on brief that Conant was an employee and officer of EASI, CAN DO, and ECO-REZ. However, petitioners did not report any income -- whether by way of salary, bonus, or commission -- from these positions. We conclude that Conant's efforts with regard to these corporations were directed toward making the corporations prosper so that his investments would be profitable. Secondly, there does not appear to be any meaningful continuity in Conant's role as a dredge/equipment operator or lessor, compost plant disassembler, or inventor. As we found, supra, Conant leased his dredge only once and that was in 1973. In 1974, Conant assisted Trussell in moving equipment from his compost plant. Not until 1975 do we have any further evidence that, in fact, Conant leased some of his equipment. We have found that Conant handled the disassembling and the shipping of a compost plant in 1975. However, we have no indication that Conant disassembled a compost plant before 1975 or thereafter. Finally, *221 we have found, supra, that in the late 1960's, Conant started building an 8-inch dredge. However, we have no indication as to what Conant invented before, during, or after the years in issue. We have found, supra, that Conant had a shop in his home in which he was developing (1) an improved cutter head for a dredge and (2) a bomb shelter. However, petitioners have not supplied us with a time frame for these activities. In conclusion, we believe continuity [19] *222 generally requires more than such isolated activity for each of the claimed trades or businesses. Industrial Research Products, Inc. v. Commissioner,40 T.C. 578, 589 (1963). Thirdly, although we recognize that a taxpayer may be engaged in more than one trade or business (see Curphey v. Commissioner,73 T.C. 766, 775-776 (1980)), we are convinced that Conant sought his livelihood from his business as a Texaco consignee and not by operating or leasing dredge/equipment, disassembling compost plants, or inventing. We have no record of Conant ever receiving money from any of these alleged trades or businesses. Moreover, even where Conant contends that he was owed money from carrying on these alleged trades or businesses, Conant never sued to recover the money. We now consider the appropriate treatment of the claimed Schedule C business expenses in light of our conclusions that during the years in issue, Conant was in the trades or business of being a Texaco consignee, and a corporate officer and employee. In disallowing a portion of the claimed Schedule C business expenses for 1974 and 1975, respondent has, in essence, divided these expenses into three categories: (1) those expenses paid on account of Conant's guarantee on a note, which respondent determined are nonbusiness bad debts entitled to short-term capital *223 loss treatment; (2) those made on behalf of the three corporations, which respondent originally determined were also nonbusiness bad debts, entitled to short-term capital loss treatment; [20] and (3) those which respondent determined are personal or unverified. We consider these categories of expenses, seriatim. A. Conant's Guarantee on a Note
Section 166(a)[21] *224 allows deductions for worthless debts. However, under section 166(d)(1)[22] *225 a nonbusiness bad debt is deductible by an individual only as a short-term capital loss. Under section 166(d)(2)[23] the debts to Conant are nonbusiness debts, unless they were acquired in connection with, or became worthless in, Conant's trades or businesses. Respondent's determination as to the amounts paid by Conant on account of Conant's guarantee on a note is presumed to be correct and petitioners bear the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
In order to prevail, petitioners must show a proximate relationship between the debt and Conant's trades or businesses as a Texaco consignee or corporate officer and employee. [24]Whipple v. Commissioner,373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs. The "proper measure [for such a relationship] is that of dominant motivation." United States v. Generes,405 U.S. 93, 103-105 (1972); Shinefeld v. Commissioner,65 T.C. 1092, 1096 (1976). For petitioners to treat the amounts paid to First Bank as business bad debts, petitioners must show that Conant's dominant motivation in guaranteeing the note for EASI was proximately *226 related to (1) his business as a Texaco consignee or (2) his status as an officer and employee of EASI, rather than as an investor in EASI. United States v. Geners,supra;Benak v. Commissioner,77 T.C. 1213 (1981); Shinefeld v. Commissioner,65 T.C. at 1097-1099; Estate of Byers v. Commissioner,57 T.C. 568, 577-578 (1972), affd. 472 F.2d 590 (CA6 1973). The parties agree that Conant operated his business as a Texaco consignee separately from his trade or business as a corporate officer and employee at EASI. We have no evidence that Conant's guarantee on a note for EASI was in any way related to his business as a Texaco consignee. The fact that a loan or payment is made in furtherance of an employer's trade or business does not mean that it is proximately related to that of the officer-employee. Townshend v. United States,384 F.2d 1008 (Ct. Cl. 1967). Benak v. Commissioner,supra;Shinefeld v. Commissioner,supra;Estate of Byers v. Commissioner,supra.Cf. Brenhouse v. Commissioner,37 T.C. 326, 330 (1961), which involved members of a partnership. On the record in the instant cases, petitioners have failed to prove that Conant's dominant motive in guaranteeing the note to First *227 Bank was the protection or enhancement of his trade or business as an officer-employee of EASI, as distinct from the enhancement of his investment interest as shareholder in EASI. [25] We conclude that petitioners have failed to carry their burden of proving that Conant's dominant motivation in guaranteeing a note to First Bank stemmed from his trades or businesses as a Texaco consignee, or as an EASI officer-employee rather than his role as an EASI investor. Petitioners assert on opening brief, "that the holdings of Generes and Anderson[26] can be extended to other areas dealing with dual status taxpayers (shareholder -- non-business status and business status) and a business bad debt should be allowed where the dominant purpose of the loan was connected with the business status of the taxpayer." In support of their position, petitioners cite six cases [27] where the courts have allowed bad debt deductions for loans or corporations. However, all of these cases are factually distinguishable from the instant cases; also, all were decided before the Supreme *228 Court set forth the standard of "dominant motivation" in Generes. On answering brief, petitioners attempt to distinguish Generes on the basis that Conant, unlike the taxpayer in Generes, had no family relationship with any director, officer, or shareholder in EASI. This difference is not significant in light of petitioners' failure to establish that Conant was engaged in any trade or business to which the debts were proximately related. For the first time, on brief, petitioners assert "that should the court fail to find these various expenses deductible to the Petitioner under §§ 162, 212 *229 or 166 of the Code, that the Court should find that such necessary and ordinary expenses (as stipulated by the Respondent) are deductible as losses under § 165 to the Petitioner as an individual, as they are losses to Petitioner in his trade(s) or business(es)." (Emphasis added.) A basic problem with this position is that we have already concluded that none of Conant's trades or businesses generated the guarantee, the payments, or the debt that became worthless. A second difficulty with petitioners' position, as applied to their losses on account of Conant's guarantee of the EASI note, is that deductibility of bad debts is governed by section 166. A loss on a guarantee is not deductible under section 165, even if the loss is also not deductible because it fails to meet one or another of the requirements of section 166. Hynes v. Commissioner,74 T.C. 1266, 1286-1287 (1980). Finally, we note that, in his opening statement at trial, respondent's counsel set forth his understanding that both sides concurred that section 165 was not applicable to the instant case.Petitioners' counsel did not dispute the correctness of this statement at that point, nor at any point until he raised this *230 "inapplicable" issue on brief. We hold for respondent on this issue. B. Expenditures on Behalf of the Three Corporations
At trial, respondent asserted that the portion of the claimed Schedule C business expenses for 1974 and 1975 that he determined were expenditures made on behalf of EASI, CAN DO, or ECO-REZ and deductible as nonbusiness bad debts, should instead be treated as contributions to capital of the respective corporation "and when the corporation goes defunct, which are not at [sic] the years at issue, except in the case of CAN DO then they would be available for non-business bad debts and short-term capital losses." [28] Petitioners contend that the expenditures are deductible under section 162 or 212. The question of whether the expenditures are debts, contributions to capital, or Conant's business or income-seeking expenses is one of fact. See, e.g., Dorminey v. Commissioner,26 T.C. 940, 946 (1956). In the usual case, petitioners would bear the burden of proof entriely. However, respondent's assertion as to capital contributions constitutes a "new matter", as to which he bears the burden of proof. Compare Estate of Emerson v. Commissioner,67 T.C. 612, 620 (1977), with *231 Florists' Transworld Delivery Assn. v. Commissioner,67 T.C. 333, 348 (1976); see Rule 142(a).
We agree with respondent's current position that (contrary to respondent's original determination) Conant's expenditures are not loans to the corporations giving rise to short-term capital losses under section 166(d), that (contrary to petitioners' position) Conant's expeditures are not currently deductible expenses under section 162 or 212, but that Conant's expenditures are contributions to capital of the respective corporations. 1. Capital Contributions v. Loans
First, we consider whether Conant's expenditures were loans or capital contributions to EASI, CAN DO, and ECO-REZ. This is an issue which has often been before the courts. In Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493-494 (1980), *232 we commented as follows: In resolving similar questions of debt versus equity, courts have identified and considered various factors. See, e.g., Estate of Mixon v. United States,464 F.2d 394, 402 (5th Cir. 1972) (13 factors); A.R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970) (11 factors); Fin Hay Realty Co. v. United States,398 F.2d 694 (3d Cir. 1968) (16 factors); [21] Georgia-Pacific Corp. v. Commissioner,63 T.C. 790 (1975) (13 factors). Among the factors which have been considered are: the names given to the certificates evidencing the indebtedness; presence or absence of a fixed maturity date; source of payments; right to enforce payments; participation in management as a result of the advances; status of the advances in relation to regular corporate creditors; intent of the parties; identity of interest between creditor and stockholder; "thinness" of capital structure in relation to debt; ability of corporation to obtain credit from outside sources; use to which advances were put; failure of debtor to repay; and risk involved in making advances. The identified factors are not equally significant ( Estate of Mixon v. United States,supra at 402), nor is any single *233 factor determinative. John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." Estate of Mixon v. United States,supra at 403. "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." Fin Hay Realty Co. v. United States,supra at 697. As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973). [21] See Astleford v. Commissioner,T.C. Memo. 1974-184, affd. per curiam 516 F.2d 1394 (8th Cir. 1975); Diamond Bros. Co. v. Commissioner,T.C. Memo. 1962-132, *234 affd. 322 F.2d 725 (3d Cir. 1963). In the instant cases, there is not a written document which would create in Conant an unconditional right to demand payment. There are no papers or other formal indicia evidencing the arrangement between Conant and either EASI, CAN DO, or ECO-REZ. Thus there are no provisions for interest, no enforceable obligation on any of the corporations to repay Conant for the amount of his expenditures, no maturinty date, no provision for prepayment by the corporations, and no provision for superiority of lien of the respective corporations' assets. It is clear that Conant and the corporations failed to follow any formality with regard to the expenditures. There was no corporate action authorizing the "borrowing", Conant did not take any security as a result of the expenditures, and there was no provision made for a sinking fund or corporate reserve to effect repayment. No repayment of the alleged debts was ever made. No interest was ever paid. No law suits were filed to attempt to recover any portion of the alleged debts and the record contains no evidence that a formal demand for repayment was ever made. In short, Conant failed to act like a creditor. *235 Instead, by tolerating nonpayment of principal, Conant evidenced an attitude of placing his shareholder interests ahead of his creditor interests in order to advance the needs of the corporations. Thus, since Conant treated these expenditures the way equity investments are normally treated, we will consider these expenditures to be equity, and not loans. 2. Capital Contributions v. Sec. 162
Next we consider whether the expenses are currently deductible under section 162 or 212, or whether they are to be treated as capital contributions. We have already found, supra, that the expenditures made by Conant on behalf of EASI, CAN DO, and ECO-REZ were not related to Conant's business as a Texaco consignee. It is well established that absent a binding obligation, a taxpayer generally may not deduct expenses incurred for the benefit to another. Deputy v. du Pont,308 U.S. 488, 493 (1940); Westerman v. Commissioner,55 T.C. 478, 482 (1970). Thus, corporate officers, employees, and shareholders who voluntarily incur corporate expenses are not entitled to a deduction for these expenditures because they are not considered necessary employee expenses. Westerman v. Commissioner,supra.The *236 reason for this rule is explained in Noland v. Commissioner,269 F.2d 108, 111 (CA4 1959) as follows: The business of a corporation, however, is not that of its officers, employees, or stockholders. Though the individual stockholder-executive, in his own mind, may identify his interest and business with those of the corporation, they legally are distinct, and, ordinarily, if he voluntarily pays or guarantees the corporation's obligations, his expense may not be deducted on his personal return. * * * On the other hand, where, as a condition of his employment, an employee incurs unreimbursed expenses on behalf of his employer, the employee may deduct those expenses which are ordinary and necessary to his business as an employee, to the extent they are not subject to reimbursement. Walliser v. Commissioner,72 T.C. 433, 437 (1979). Conant in his capacity as officer and employee in EASI, CAN DO, and ECO-REZ was not required to pay the expenditures on behalf of the corporations. Conant voluntarily made the expenditures and the expenditures are not deductible by petitioners. Conant's attempt to sell chemicals to Allied Polymer was an activity directly related to his business as a Texaco *237 consignee. The expenses of this activity are deductible under section 162. Petitioners have the burden of proving that their deductions are greater than the amount determined by respondent. In Cohan v. Commissioner,39 F.2d 540 (CA2 1930), it was held that when the Court was convinced that some expenses were paid or incurred, then some amount should be allowed even though the taxpayer has not shown the precise amount that should be allowed. In the instant case, it is obvious that Conant incurred some expenses in his business as a Texaco consignee. However, respondent has determined that some deductions should be allowed (see tables 1, 2, and 3, supra). Petitioners have not shown that they should be entitled to any greater deductions than those already allowed by respondent. Petitioners maintain that the expenditures made on behalf of EASI and ECO-REZ should be deductible because they were made under duress and pursuant to his duty as a retired United States Army officer. Petitioners assert that Conant's "involvement with the corporations EASI and EcoRez [sic] was in an attempt by him to maintain contact with * * * various individuals and corporations so that he might secure information *238 vital to his country's safety." An individual's concerns about the safety of this Nation are commendable. However, we fail to see how such concerns would convert the expenditures in issue into deductions. We conclude that petitioners are not entitled to deductions under section 162 for any greater amounts than respondent has already allowed. 3. Capital Contributions v. Sec. 212
Section 212 [29] allows deductions for expenses with respect to an income-producing activity or property held for the production of income. The test of deductibility under section 212(1) and (2) is similar to that under section 162 with the exception that the expense need not be incurred in a trade or business. See, e.g., Rodney v. Commissioner,53 T.C. 287, 320 (1969). As we pointed out in Deely v. Commissioner,73 T.C. 1081, 1097-1098 (1980) *239 -- [B]efore petitioner is entitled to the benefits of section 212, he must overcome two hurdles: Petitioner must show that the expenses claimed are indeed his and not those of a separate and distinct taxpayer ( Deputy v. Du Pont, [308 U.S. 488, 494 (1940)]; Kaplan v. Commissioner,21 T.C. 134 (1953)), and the expenses claimed must be ordinary and necessary and bear a reasonable and proximate relation to the production or collection of income. Sec. 1.212-1(d), Income Tax Regs.; Kinney v. Commissioner,66 T.C. 122 (1976). Conant's expenditures on behalf of EASI, CAN DO, and ECO-REZ, were just that -- expenditures on behalf of another. Petitioners are no more entitled to deduct such expenditures under section 212 than they are under section 162. Respondent concedes that Conant's expenditures on behalf of EASI, CAN DO, and ECO-REZ may be treated as contributions to the capital of the respective corporations. We so hold. C. Personal or Unverified Expenses
Deductions are allowable under section 162 for the taxpayer's ordinary and necessary expenses in carrying on a trade or business. However, because of section 262, [30] personal expenses generally are not deductible. Sharon v. Commissioner,66 T.C. 515, 522-525 (1976), *240 affd. 591 F.2d 1273, 1275 (CA9 1978). Under section 6001 [31] *241 and section 1.6001-1(a) and (e), Income Tax Regs., a taxpayer must keep such permanent books of accounts or records as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown on his tax return. At trial, Conant admitted that some of the claimed expenses for the years in dispute, were personal items. Furthermore, Conant's testimony as to some of the other items is confusing. Petitioners presented no documentation at trial to substantiate their claimed deductions. Conant's uncorroborated and sel-serving testimony is insufficient to overcome respondent's presumption of correctness on this issue. Petitioners assert for the first time, on opening brief, justification for some of the disallowed deductions for salary, rent, and station expenses in 1974. Mere statements on brief do not constitute evidence. Evans v. Commissioner,48 T.C. 704, 709 (1967), affd. 413 F.2d 1047 (CA9 1969); Rule 143(a). Petitioners had the burden of proving respondent's determinations to be in error and they have failed completely to do so. We hold for respondent on this issue. We summarize our holdings with respect to the Schedule C business expenses for 1974 and 1975 as follows: (1) petitioners are entitled to *242 nonbusiness bad debt deductions for 1974 and 1975 in the amounts of Conant's payments in the respective years on account of his guarantee of EASI's note, (2) petitioners must capitalize Conant's other expenditures on behalf of EASI, CAN DO, and ECO-REZ, and (3) petitioners have failed to show that they are entitled to deduct or capitalize any of the Schedule C items that respondent disallowed as personal or unverified. II. Schedule C Business Expenses -- 1976
Respondent maintains that the amounts claimed on petitioners' 1976 tax return "as returns and allowances of $3,987.40 are not deductible in the tax year 1976 because it has not been established that these are [petitioners'] expenses." Respondent further contends that $35,815.89 of the deductions "shown as business expenses * * * [on the Schedule C are nondeductible] because it has not been established that * * * [they were] for ordinary and necessary business expenses or [were] expended for the purposes designated." Petitioners maintain that the $3,987.40 garnished from Conant's commission checks from Texaco is deductible under section 166 as a business bad debt. Petitioners further assert that the other disallowed Schedule C *243 business expenses are deductible under section 162, section 212, or section 165. We agree in part with each side. Petitioners have the burden of proving respondent's determinations to be in error. Welch v. Helvering,supra; Rule 142(a). We have already found, supra, that Conant's attempt to provide Allied Polymer with certain chemicals was an activity of Conant's business as a Texaco consignee. Incorporating herein our earlier analysis of the requirements to establish a business bad debt under section 166 (part I.A., supra), we are convinced that Conant's primary motivation in guaranteeing the note for ECO-REZ was proximately related to his business as a Texaco consignee. Conant intended to sell the chemicals to Allied Polymer through his business as a Texaco consignee. Conant expected to receive a minimum of $10,000 in commission from such sales. When Conant returned from Ireland, he arranged for ECO-REZ to assist Allied Polymer with its financial difficulties. His guarantee on the $72,000 note for ECO-REZ was motivated by his interest in earning additional commission from his sales of Texaco products. The $3,987.40 garnished from Conant's commission checks from Texaco was a *244 business bad debt. To receive a deduction, the business bad debt must, however, be shown to be totally worthless in the year for which it is claimed. (Sec. 166(d)(1)(A).) [32] The debt arose from a preexisting enforceable obligation. The record contains little information on the financial situation of ECO-REZ from 1974 through 1976. ECO-REZ did not make any payments on the note. Upon ECO-REZ's failure to pay, the Citizens Bank sued Conant as guarantor. The Citizens Bank garnished $3,987.40 from Conant's commission checks from Texaco. While the matter is not free from doubt, we conclude that the business bad debt became worthless in 1976, when the garnishment was made. We hold for petitioners on this issue. As to the remaining disallowed Schedule C business expenses for 1976, petitioners have, in general, failed to carry their burden of proof. However, in part I.B. of this opinion, supra, we held that Conant's 1974 and 1975 expenditures on behalf of EASI, CAN DO, and ECO-REZ should be treated as contributions to the capital of the respective corporations. *245 We conclude that the same analysis is applicable to Conant's 1976 expenditures on behalf of the corporations. We hold that (1) petitioners are entitled to a business bad debt deduction of $3,987.40, (2) petitioners must capitalize Conant's other expenditures on behalf of EASI, CAN DO, and ECO-REZ, [33] and (3) petitioners have failed to show that they are entitled to deduct or capitalize any of the Schedule C items that respondent disallowed as personal or unverified. III. Dividend Income -- 1976
Respondent maintains that during 1976, petitioners received dividend income from petitioners' wholly-owned business, Santa Fe Fuels, Inc., in the amount of $1,690.93. Respondent asserts that Santa Fe Fuels, Inc., paid various personal expenses for petitioners. Petitioners made no reference to respondent's adjustment for dividend income on petition, at *246 trial, or on opening brief. We need not decide whether petitioners' silence constitutes a concession because the matter is resolvable on burden of proof grounds. Respondent's determination as to matters of fact in the notice of deficiency "has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong." Welch v. Helvering,290 U.S. at 115; Rule 142(a). Petitioners have failed to introduce any evidence on the issue of dividend income. On answering brief, petitioners assert that while respondent's notice of deficiency is granted presumptive status, it "is not competent evidence of the truth of the matters asserted within itself." Petitioners state that "[r]respondent has brought forth no evidence to support his contention of a constructive dividend, thus the omission of such evidence, shown by Petitioner's [sic] advancing of Respondent's agent's workpapers, establishes * * * that Petitioner [sic] should prevail on this issue." Petitioners' view of the situation is clearly erroneous. Petitioners apparently have failed to comprehend the fact that they have the burden of proof on this issue. Petitioners have failed to carry their burden *247 of proof. We hold for respondent on this issue. IV. Section 6653(a) -- Negligence, Etc.
Respondent contends that petitioners are liable for an addition to tax under section 6653(a) for each of the years in issue because of "the total absence of any proper recordkeeping or proper documentation of the claimed responses by the petitioners." Petitioners maintain that respondent's audit of their 1973 return resulted in their owing a nominal amount of additional taxes. In reliance on the results of this audit, petitioners assert that they "believed that the expenses here at issue were of such a nature as to allow deduction. * * * [Accordingly] he had an honest misunderstanding or difference of opinion as to the deductibility of the items contested for the years at issue, based on the actions of the Respondent in the audit for 1973, the year immediately preceeding the years at issue of 1974, 1976 [sic] and 1976." An addition to tax under section 6653(a)[34] is imposed if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations. Petitioners have the burden of proving error in respondent's determinations that this addition to tax should be *248 imposed against them. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). As we explained, supra (issue I.C.), under section 6001 and section 1.6001-1(a) and (e), Income Tax Regs., a taxpayer must keep permanent books of account or records to establish the amount of gross income, deductions, credits, or other matters required *249 to be shown on their tax return. When Conant left the IRS, he was chief of an audit section; albeit in the 1930's, we have no doubt that in his position he realized the importance of maintaining books of account or records. Petitioners' failure to keep the records necessary to substantiate some of their claimed deductions for 1974, 1975, and 1976 -- a failure which petitioners have not adequately explained -- indicates that petitioners were negligent. Not only have petitioners failed to prove error by respondent in this matter, but the record supports the conclusion that petitioners were negligent. In responding to petitioners' assertions, we note that we have insufficient facts from the 1973 audit to agree with petitioners. Petitioners, having the burden of proof, should have introduced evidence as to the specific expenses claimed on their 1973 return and the corresponding adjustments. We have no indication whether the same types of expenses (whether or not in similar amounts) were claimed on this return. The fact that it was determined that petitioners owed only $184 in additional taxes does not carry the burden for petitioners. On the contrary, it indicates that petitioners' *250 1973 tax return did not properly represent their activities for 1973. We hold for respondent on this issue. Decisions will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue. ↩
2. Of these amounts, self-employment taxes under chapter 2 are $1,042.80 for 1974, $1,113.90 for 1975, and $1,208.70 for 1976; the remaining amounts are chapter 1 income taxes.
3. The record does not provide an explanation as to the nature of the lawsuits.↩
4. The record fails to indicate how much money was involved.↩
5. The record fails to indicate the amount of the note guaranteed by Conant. ↩
6. It does not appear that any such amounts were paid in 1976.↩
7. The record fails to indicate if the Citizens Bank also sued the other two guarantors. ↩
8. Petitioners chose to deduct this item on their 1976 tax return as "returns and allowances", but inked in the explanation "garnishment". See table 3, infra. Respondent does not contend that this affects the validity of the tax return. See Beard v. Commissioner,82 T.C. 766 (1984), affd. 793 F.2d 139↩ (CA6 1986).
9. The record does not indicate whether Barrett repaid any money to Conant.↩
10. Apparently, respondent now contends that only $7,738.72 was so paid, and that the remaining $132.86 is a personal payment to "AMEX", which we assume is the entity we refer to as "AMAX". ↩
11. Because of the manner in which respondent's determinations are presented in the notice of deficiency, we are unable to ascertain which of the Schedule C adjustments were determined to be currently recognizable short-term capital losses and which were determined to fall into other categories (e.g., personal expenditures or contributions to capital of one or another of the corporations).↩
12. On the notice of deficiency, respondent erroneously failed to include this adjustment in parentheses, indicating that this adjustment is to be added to petitioners' total cost of goods sold on the Schedule C. However, this error by respondent does not affect his determination that the revised amount of petitioners' total cost of goods sold is $34,708.36.↩
13. In the notice of deficiency, respondent determined that Conant's net profit was $26,690.64; this is the correct algebraic sum of (1) the loss petitioners reported on their tax return, and (2) the adjustments in the notice of deficiency. However, the parties' written stipulation states that, in the notice of deficiency respondent determined that Marcus' net profit was $26,640.64. It is not clear whether (a) the written stipulation contains a typographic error that persists in a subsequent oral stipulation, or (b) the written stipulation corrects an error in the notice of deficiency, or (c) the oral stipulation corrects an error in the written stipulation. The parties are to resolve this matter in the computation under Rule 155. Unless indicated otherwise, all rule references are to the Tax Court Rules of Practice & Procedure. ↩
14. On the notice of deficiency, respondent erroneously enclosed this adjustment in parentheses, indicating that this adjustment is to be subtracted from petitioners' total income on the schedule C. However, this error by respondent does not affect his determination that the revised amount of petitioners' "Total income" is $47,124.96.↩
15. Three transactions, resulting in gains of $107.46 and $331.25, and a loss of $39.92. ↩
16. Five transactions, resulting in gains of $119.63, $162.05, $80.97, and $411.64, and a loss of $420.59.↩
17. Petitioners do not contend that petitioner Anne L. Conant carried on a trade or business during the years in issue. As a result, we focus exclusively on Conant's activities in our analysis. ↩
18. Section 162(a) provides, in relevant part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.↩
19. Petitioners cite Hazard v. Commissioner,7 T.C. 372 (1946), as support for the proposition that "a taxpayer who rents out even a single piece of property is engaged in a trade or business." Petitioners have apparently overlooked the important point that the taxpayer in Hazard continuously rented the property for almost four years; thus distinguishing Hazard from the instant cases. The question is whether Conant's "activities were sufficiently systematic and continuous" ( Curphey v. Commissioner,73 T.C. 766, 775 (1980)) to place him in any of his contended-for trades or business. The answer is, "No".
20. Respondent now asserts that these expenditures are contributions to the capital of the respective corporations. The effect of respondent's new assertion will be discussed infra.↩
21. SEC. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes wortheless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. [The subsequent amendment of this provision by section 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant case.] ↩
22. SEC. 166. BAD DEBTS. * * * (d) Nonbusiness Debts. -- (1) General rule. -- In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. [The subsequent amendments of this provision by paragraphs (1)(A) and (2) of section 1402(b) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1731, 1732, and by subsections (b)(1) and (e) of section 1001 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 1011-1012, do not affect the instant case.] 23. SEC. 166. BAD DEBTS. * * * (d) Nonbusiness Debts. -- * * * (2) Nonbusiness debt defined. -- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than -- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
24. Petitioners do not contend they were in a separate trade or business of guaranteeing notes or of making loans.↩
25. Indeed, on brief, petitioners state that "it is not claimed that the loans made by the Petitioner were to protect an employment status".↩
26. In Anderson v. United States,555 F.2d 236↩ (CA9 1977), the Court of Appeals affirmed, as not clearly erroneous, a lower court's conclusion that the dominant motive for Anderson's loan to a corporation was to protect his job. 27. Lundgren v. Commissioner,376 F.2d 623 (CA9 1967), revg. T.C. Memo. 1965-314; Estate of Saperstein v. Commissioner,T.C. Memo. 1970-209; Morrow v. Commissioner,T.C. Memo. 1965-45; Rubin v. Commissioner,T.C. Memo. 1963-218; Wade v. Commissioner,T.C. Memo. 1963-50; and Schafer v. United States, unreported opinion ( W.D. Okla. 1968, 21 AFTR 2d 1087↩, 68-1 USTC par. 9306).
28. We are unclear as to respondent's rationale in concluding that the contributions to capital would ultimately be deductible as short-term capital losses, since the relevant holding periods appear to be longer than 6 months and a contribution to capital is not a debt which may become worthless. On this point (as on a number of points) the parties' delineations of their positions leave us with significant uncertainties.↩
29. Section 212 provides, in relevant part, as follows: SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * *↩
30. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter [i.e., chapter 1], no deduction shall be allowed for personal, living, or family expenses.↩
31. SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENT, AND SPECIAL RETURNS. Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary or his delegate may from time to time prescribe. Whenever in the judgment of the Secretary or his delegate it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary or his delegate deems sufficient to show whether or not such person is liable for tax under this title. * * * [The subsequent amendment of this provision by section 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant case.]↩
32. Petitioners do not claim a deduction for any part of the $3,987.40 on account of partial worthlessness, under section 166(a)(2)↩.
33. We have found that CAN DO was dissolved in 1976. Petitioners did not claim a deduction on account of this dissolution; respondent has not claimed that Conant had a gain on account of this dissolution. We hold that petitioners realized a 1976 long-term capital loss in the amount of Conant's contributions to CAN DO in 1974, 1975, and 1976.↩
34. SEC 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. [The subsequent amendments of this provision (by sec. 101(f)(8) of the Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, 94 Stat. 229, 253, by sec. 722(b)(1) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 342, and by sec. 107(a)(3) of the Technical Corrections Act of 1982, Pub. L. 97-448, 96 Stat. 2365, 2391) do not affect the instant case.]↩